**FIRST VALLEY BANK OF LOS FRESNOS, Norwest Bank of Texas, N.A., and Wells Fargo Bank (Texas), N.A., Petitioners,**

v.

**Sam MARTIN, Respondent.**

No. 01–0910.

Supreme Court of Texas.

Argued Jan. 28, 2004.

Decided Sept. 3, 2004.

Rehearing Denied Oct. 15, 2004.

---

Raul A. Gonzalez, Locke Liddell & Sapp, LLP, Austin, Luis R. Hernandez, Tom Fleming, Fleming & Hernandez, P.C., Brownsville, C.W. "Rocky" Rhodes, Houston, for petitioner.

Sean Paul Belleville, Ernesto Gamez Jr., Law Offices of Ernesto Gamez, Jr., Thomas G. Sharpe Jr., Brownsville, and Larry Zinn, San Antonio, for respondent.

Justice BRISTER delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice HECHT, Justice OWEN, Justice O'NEILL, Justice JEFFERSON, Justice SMITH, and Justice WAINWRIGHT joined.

A debtor violates the Texas Penal Code if he removes, conceals, or sells secured property with intent to appropriate it.[1] In this case, a jury found that Sam Martin owed $50,000 to First Valley Bank of Los

Fresnos, and he admits he sold a substantial part of the collateral and kept the money for himself.

Yet Martin claims the Bank maliciously prosecuted him by complaining to the authorities, who indicted him but later dismissed the charges. A Cameron County judge and jury agreed, awarding Martin more than $18 million. The court of appeals affirmed, but reduced the damages award to $4.33 million.[2]

As a matter of law, we find no evidence that the Bank procured the charge on which Martin was indicted. While the Bank might have handled its collection efforts differently, there was no evidence it exceeded the parties' loan agreements. No credit system in the world can last long if creditors are punished for lawfully demanding their money back. Accordingly, we reverse.[3]

In March 1996, Sam Martin renewed his loan at the Bank for the ninth time, agreeing to pay principal of $30,323.15 plus interest, and pledging all his livestock as security. Thereafter, Martin took a ranching job in Colorado, where (as he admitted at trial), "I had an address up there, but it was a ranch house out in the middle of a ranch of about 16,000 acres up in the mountains." When the loan came due in September 1996 and the Bank demanded payment, Martin told his son to "tell them I will be there during the Christmas holidays and renegotiate the loan with them."

Unwilling to wait, the Bank accelerated the note without notice, as the security agreement provided it could do. When Martin returned to the area and deposited a $1,500 check in his account, the Bank

---

1. Tex. Pen.Code § 32.33.

2. 55 S.W.3d 172, 194.

3. Because there was no evidence of either a false statement or a failure to disclose information that was material to Martin's sale—the only indicted offense—we need not decide whether the Bank preserved error, if any, regarding the Court's charge allowing liability on either ground.

offset it against his outstanding loan, again as the loan documents provided it could do.

Irate at the Bank's actions, Martin informed a bank officer "I'm going to leave the bank and you will not hear from me again until that money is put back into my account." True to his word, from that time forward Martin refused to speak with anyone at the Bank, or to pay anything to the Bank.

But he did hire an attorney in New Mexico to "advise the Bank where their cattle was." The attorney sent a letter to the Bank identifying three ranches where 75 head were located. But the ranches were huge and the cattle wild, so only twenty could be rounded up. The Bank sold these for $200 a head and credited Martin's note.[4]

Unable to contact Martin or locate the other cattle, the Bank complained to the authorities—which it had every right to do. A deputy sheriff investigated, and could not locate Martin or the cattle either. He testified that the three ranches Martin identified covered more than 250 square miles of rough country and contained skittish cattle belonging to many owners, so those belonging to a particular owner could not be identified except by scouring the whole area and corralling them all. The deputy testified that the Bank never told him that twenty cattle had been found, sold, and credited to Martin's account.

The deputy presented the results of his investigation to the district attorney's office. Although his report and the Bank officer's supporting affidavit focused solely on the collateral cattle that could not be found, Martin was indicted for selling or disposing of secured property in violation of the following penal statute:

> A person who is a debtor under a security agreement, and who does not have a right to sell or dispose of the secured property or is required to account to the secured party for the proceeds of a permitted sale or disposition, commits an offense if the person sells or otherwise disposes of the secured property, or does not account to the secured party for the proceeds of a sale or other disposition as required, with intent to appropriate (as defined in Chapter 31) the proceeds or value of the secured property. A person is presumed to have intended to appropriate proceeds if the person does not deliver the proceeds to the secured party or account to the secured party for the proceeds before the 11th day after the day that the secured party makes a lawful demand for the proceeds or account.[5]

When Martin returned to the area in March 1998, he was arrested and released on bond. The charges were dropped a few months later.[6]

---

4. The cattle were sold to a brother of a bank director at a price Martin claims was half of what they were worth. But any claim that the Bank's sale was not commercially reasonable, *see* TEX. BUS. & COM.CODE § 9.610 (formerly § 9.504), was resolved against Martin by the jury's finding that he owed the Bank the full $50,000 it claimed, a finding he does not challenge on appeal.

5. TEX. PEN.CODE § 32.33(e). Although the indictment alleged Martin sold or disposed of cattle in January of 1997, neither party nor the investigating officer knew of any such

sale. All agreed that Martin sold 58 head of cattle in January of 1995.

6. A news article (admitted at trial over the Bank's objection) quotes prosecutors as saying they "dropped the charge only because of a technical flaw in the written indictment, but plan to reindict Martin on the same charge soon." Martin argues the charge was dropped when information was provided indicating his cattle were somewhere in the area. In any event, the charge was never refiled.

■ Taking each element of the statute in turn, Martin admitted at trial that he:

- is a debtor on an overdue note,[7] and (in his own words) "I will not pay that note";
- signed a security agreement requiring prior notice to the Bank before selling calves, and written consent from the Bank before selling other cattle;
- sold 58 head of cattle in January 1995 without the Bank's written consent; and
- kept most of the proceeds.[8]

■ These admissions establish all the objective elements of the crime. When the objective elements of a crime reasonably appear to have been completed, a private citizen has no duty to inquire whether the suspect has some alibi or explanation before filing charges.[9] Accordingly, as a matter of law Martin cannot establish the absence of probable cause, as he must do to prove malicious prosecution.[10]

The court of appeals found to the contrary for three reasons. First, the court of appeals found the evidence of malicious prosecution legally sufficient because the Bank reported it could not find any of Martin's cattle, when in fact it had found and sold twenty.[11] But this statement was immaterial to the indictment that ultimately issued—Martin was indicted for the cattle *he* sold, not for cattle *the Bank* found and sold. "[A] person who knowingly provides false information to the grand jury or a law enforcement official who has the discretion to decide whether to prosecute a criminal violation cannot be said to have caused the prosecution if the information was immaterial to the decision to prosecute."[12] There was no evidence the Bank made any false statement about Martin's sale, the only crime for which he was indicted. Because the prosecution was only for the cattle Martin sold, any false statements regarding other cattle were immaterial to it.

■ Second, the court of appeals found the Bank could be liable for failing to disclose material facts, even if it made no false statements.[13] We have expressly held that fair disclosure is relevant to malice and causation, "but ha[s] no bearing on probable cause."[14] Once a citizen has probable cause to report a crime, there can be no malicious prosecution, even if the subsequent report fails to fully disclose all relevant facts.[15] As Martin admitted the objective elements of the crime, he could not prove the Bank lacked probable cause by pointing to omissions from its report.

■ Finally, the court of appeals held the Bank waived its lien on the 58 cattle Martin sold because a director of the Bank helped move them for the sale. While recognizing that a director is usually not an agent of a corporation,[16] the court of appeals nevertheless held the director had apparent authority because of the Bank's

---

7. Q: [By defense counsel] And you admit, do you not, that that note is now long past due, by almost two years?
A: [By Martin] Yes, Sir, I do.

8. While Martin's son testified that his father "renewed his note and paid some principal" with the proceeds, Martin admitted receiving more than $13,000 from the sale and paid less than $3,000 to the Bank during the period.

9. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex.1997).

10. *Id.* at 517.

11. 55 S.W.3d 172, 182.

12. *King v. Graham*, 126 S.W.3d 75, 78 (Tex. 2003) (per curiam).

13. 55 S.W.3d at 186–87.

14. *Richey*, 952 S.W.2d at 519.

15. *Id.*

16. 55 S.W.3d at 183 (citing RESTATEMENT (SECOND) OF AGENCY § 14C (1958)).

"ostensible acquiescence to [the director's] involvement with Martin's loan."[17]

 This is wrong on several levels. First, apparent authority must be based on the acts of the principal.[18] There was no proof that the bank authorized this director to do anything on Martin's loan; the only proof offered was Martin's testimony that "he was, I'm sure, consulted when they.... When the loan is made, it has to go before the board of directors, unless it's a real small loan, and they have to approve it." Aside from the fact that this is pure speculation, it asserts no act by the Bank that clothed the individual directors with apparent authority to act on their own toward outsiders. When a corporation's directors vote at a meeting, that does not authorize them to act unilaterally on the corporation's behalf; indeed, the former is precisely the opposite of the latter.

 Second, apparent authority is limited to the scope of responsibility that is apparently authorized.[19] Requiring bank directors to approve a loan on a record vote does not authorize them to orally release the collateral or forgive the debt. If apparent authority could do that, in many cases it would be an apparent violation of federal law.[20]

 Third, there is no evidence the director ever waived any of the Bank's rights expressly; Martin asserts only an implied waiver. Waiver may be implied only if the surrounding facts clearly demonstrate it; there can be no waiver if the actor says and does nothing inconsistent with its rights.[21] Bankers have every reason to help a debtor sell collateral at a good price, *as long as the bank gets paid.* Even if the actions alleged here were authorized by the Bank, they might imply approval of the sale, but give no indication whatsoever that the Bank did not care what happened to the money. As a matter of law, there is no indication in the director's actions of an intent to waive the Bank's security interest in the proceeds of Martin's sale.[22]

Martin asserts there was no probable cause to believe his sale of the 58 head of cattle violated the Penal Code for a reason besides the alleged waiver. He maintained throughout the trial that he pledged only 75 head of cattle, and could not have intended to impair the Bank's collateral as he had more than 100 cattle somewhere in south Texas after the sale. But every security agreement he signed (there were nine in all) stated that *all* his cattle were pledged as collateral:

> The collateral shall consist of all the following described property and Owner's rights, title and interest in such property whether now owned or hereafter acquired by Owner and wheresoever located:
>
> * * *
>
> ALL LIVESTOCK NOW OWNED OR HEREAFTER ACQUIRED BY DEBT-

17. *Id.* at 184.

18. *Ins. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 672 (Tex.1998) (holding authority to collect and transmit applications and bonding fees insufficient to bestow apparent authority to provide investment counseling services).

19. *See id.* at 673–74.

20. *See D'Oench, Duhme & Co. v. Fed. Deposit Ins. Corp.,* 315 U.S. 447, 458, 62 S.Ct. 676, 86 L.Ed. 956 (1942) (holding that debtor cannot assert against bank or receiver defense based on secret agreement not appearing in bank's records).

21. *Jernigan v. Langley,* 111 S.W.3d 153, 156 (Tex.2003) (per curiam). For the same reason, no renewal of the loan on the same terms after Martin's sale waived any claim to the proceeds he kept.

22. *See* Tex. Bus. & Com.Code § 9.315(a).

OR, WHEREVER LOCATED INCLUDING BUT NOT LIMITED TO SEVENTY–FIVE (75) HEAD OF CROSSBREED CATTLE. (Emphasis in original).

Martin admitted he knew this is what the loan documents said.[23]

 Martin claimed there was an oral agreement the loan would be secured by only 75 head of cattle, pointing for support to a notice of the security interest and a pre-loan appraisal. It is elementary that none of these could alter or amend the Bank's security agreement. No pre-loan discussions or appraisal could survive the security agreements the parties actually signed.[24] Nor could the notice to third parties amend the loan documents between the first two.[25] If security documents in Texas mean what they say (and no credit system can survive if they do not), as a matter of law Martin pledged *all* his livestock.

To sum up, nothing the Bank reported or failed to report caused the indictment relating to Martin's cattle sale. The documents Martin signed required him to pay the loan when it came due, and assemble the cattle at the Bank's request if he did not;[26] he makes no apology for failing to do either. As a matter of law, Martin owes the Bank, not the other way around.

For the forgoing reasons, we reverse the court of appeals' judgment, and remand to the trial court for entry of judgment in favor of the Bank in accordance with the jury's finding regarding Martin's debt to the Bank.[27]

Justice WAINWRIGHT filed a concurring opinion.

Justice SCHNEIDER did not participate in the decision.

Justice WAINWRIGHT concurring.

The Court today decides that Sam Martin failed to prove that there was an absence of probable cause in his lawsuit for malicious prosecution against First Valley Bank of Los Fresnos. I join the Court's opinion. Alternatively, First Valley contended that negligent conduct is insufficient to state a claim for malicious prose-

---

23. Q: [By defense counsel] The security agreement, does it not, says all livestock now owned or hereafter acquired?
A: [By Martin] Yes, sir. That's standard language on a note for cattle.
Q: Did you understand that to be the language at the time you signed the security agreement?
A: I certainly did, sir.

24. *See* Tex. Bus. & Com.Code § 26.02; see also *Barker v. Coastal Builders*, 153 Tex. 540, 271 S.W.2d 798, 803 (Tex.1954) (noting general rule that prior oral agreements are merged in later written instruments); *Jones v. Risley*, 91 Tex. 1, 32 S.W. 1027, 1029 (1895) (same).

25. *See Crow–Southland Joint Venture No. 1 v. N. Fort Worth Bank*, 838 S.W.2d 720, 723–24 (Tex.App.-Dallas 1992, writ denied) (noting security agreement defines collateral to enable debtor and other interested persons to identify property that creditor may claim as security, while financing statement merely notifies third parties that the debtor's property is or may be encumbered); *Villa v. Alvarado State Bank*, 611 S.W.2d 483, 486–87 (Tex.Civ.App.-Waco 1981, no writ) (same); *see also Marine Drilling Co. v. Hobbs Trailers*, 697 S.W.2d 831, 833 (Tex.App.-Corpus Christi 1985, writ ref'd n.r.e.) (holding financing statement description need not be so specific that the property may be identified by it alone).

26. *See* Tex. Bus. & Com.Code § 9.609(c) (formerly § 9.503) (providing secured party may require debtor to assemble collateral and make it available at a designated place).

27. Although some of Martin's witnesses suspected the Bank of stealing or otherwise obtaining some of the missing cattle, the jury's finding that Martin owed the entire $50,000 outstanding shows they did not credit those claims.

cution; intentional conduct is required. The Court does not reach that issue. First Valley also raises a waiver issue that needs to be settled. Martin asserts that the Bank failed to preserve error on the question of whether malicious prosecution may be predicated on negligent conduct or only on intentional conduct because the Bank did not follow the technical requirements of Rule 276 of the Texas Rules of Civil Procedure in objecting to the charge. I write to address this waiver issue.

## I.

Martin sued First Valley for negligence and misrepresentation arising from its efforts to collect a $30,000 loan from him. Martin claims that First Valley provided an investigator with false information which the investigator turned over to the district attorney's office. The district attorney's office convened a grand jury which indicted Martin for the crime of hindering a secured creditor's collection efforts. *See* TEX. PEN.CODE § 32.33(e). After being cleared of the criminal charge on an apparent technicality, Martin filed a civil action against First Valley claiming the bank did not disclose to the investigator all material information. The civil case proceeded to trial.

After plaintiff rested, the trial court heard First Valley's motions for directed verdict. First Valley argued that Martin's petition only alleged negligence and, because under Texas law malicious prosecution is an intentional tort, it was entitled to a directed verdict. After the hearing, Martin sought leave to file a Third Amended Original Petition, which for the first time alleged malicious prosecution. The trial court allowed the trial amendment over the objection of First Valley that the amendment added an intentional tort in the middle of trial when the case had been tried solely on negligence. Later that same afternoon, First Valley submitted its "Requested Jury Instructions and Questions." First Valley's proposed charge, set forth below, instructed the jury that malicious prosecution required intentional conduct.

Do you find that First Valley Bank procured the criminal prosecution of Sam Martin?

You are instructed that a person procures a criminal prosecution if his actions were enough to cause the prosecution and, but for his actions, the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, *unless the person provides information which he knows is false.* A criminal prosecution may be procured by more than one person. *Browning–Ferris Indus. v. Lieck,* 881 S.W.2d 288 (Tex.1994).

(emphasis added). First Valley's requested submission included blanks at the bottom of the page labeled "refused" and "modified as follows." The trial judge checked "modified as follows," placed brackets around First Valley's procurement instruction, and signed the request.

The trial court held a formal charge conference the next morning. During the charge conference First Valley objected to the question on malicious prosecution on no evidence grounds but did not reiterate its position that the procurement instruction was an incorrect statement of the law. The trial court overruled First Valley's evidentiary objection and presented the court's charge to the jury. The court defined malicious prosecution such that it could be satisfied by either inadvertence or intentional conduct.

"Procurement" means: A person procures a criminal prosecution if his ac-

tions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, *unless the person fails to fully and fairly disclose all material information known to him or knowingly provides false information.* A criminal prosecution may be procured by more than one person.

(emphasis added). This charge tracks the Pattern Jury Charge. *See* Comm. on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges_General Negligence & Intentional Personal Torts PJC 6.4 (2002).

## II.

First Valley argues that the trial court's definition of procurement misstates the law and that its complaint is preserved because its request was marked "modified as follows" and signed in substantial compliance with Rule 276. *See* Tex.R. Civ. P. 276. Martin, on the other hand, argues that First Valley failed to comply with Rule 276 which, to preserve asserted error, requires the phrase "modified as follows: (stating in what particular the judge has modified the same) and given, and exception allowed" to be included by the trial judge in his order modifying a proposed submission. *See id.* Therefore, Martin claims that error is waived. I believe that First Valley preserved its complaint and that Rule 276 does not govern preservation of charge error in this case. Rule 274 applies.

## III.

Texas Rules of Civil Procedure 271 through 279 govern preservation of error in the jury charge. Traditionally, the manner of preserving charge error too often created technical traps through procedures that elevated form over substance. Through rule changes and opinions, we have endeavored to focus appellate review on substantive issues and simplify the procedures for error preservation. In 1992, in *State Department of Highways & Public Transportation v. Payne,* the Court took a significant step forward in this process by holding that in some cases a request can serve as an objection sufficient to preserve error in a jury charge. 838 S.W.2d 235, 240 (Tex.1992). We explained that "[t]here should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *Id.* at 241. Under *Payne,* a request can serve as an objection for preservation purposes as long as the trial court is aware of the complaint and issues a ruling. *Id.* at 240–41. *But see Hernandez v. Montgomery Ward,* 652 S.W.2d 923, 925 (Tex.1983) ("A request for another charge is not a substitute for an objection."), *overruled on other grounds by Acord v. General Motors,* 669 S.W.2d 111 (Tex.1984).

The parties dispute whether alleged error arising from the trial court's submission of an allegedly defective instruction on procurement was preserved. The parties and the court of appeals analyze this preservation issue under Rule 276. Rule 276 provides that when an instruction is "requested" and the trial judge modifies it, to preserve error the judge must specify how the instruction was modified, endorse "exception allowed" on the request and sign it. Tex.R. Civ. P. 276. If this procedure is properly followed, the party requesting the instruction is entitled to appellate review without the necessity of preparing a formal bill of exceptions. *Id.* Rule 276 governs preservation where a requested instruc-

tion, question, or definition is required; however, that is not this case.

Rule 274 governs this case. Rule 274 provides:

A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection. Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections.

TEX.R. CIV. P. 274. It is clear that to preserve a complaint that an instruction in a charge is defective, the party who does not rely on the instruction need only object, and a request in substantially correct language is not required. *See* TEX.R. CIV. P. 274; *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994) ("[A]n objection is sufficient to preserve error in a defective instruction. A request of substantially correct language is not required."); *Payne*, 838 S.W.2d at 241; *Angelina Cas. Co. v. Holt*, 362 S.W.2d 99, 101 (Tex.1962) ("The law is that where the court gives a definition which is defective, an objection by the opposite party is sufficient to preserve his rights, and it is not necessary for him to tender a correct definition."); *Johnson v. Johnson*, 869 S.W.2d 490, 492 (Tex.App.-Eastland 1993, writ denied) ("[T]he proper method of preserving error as to a question, definition, or instruction actually submitted is by objection, regardless of whether the issue is relied upon by the complaining party."); *Diamond Shamrock Ref. and Mktg. Co. v. Mendez*, 809 S.W.2d 514, 521 (Tex.App.-San Antonio 1991) (noting in the case of a defective instruction "the defect may properly be called to the court's attention by an objection without requesting a substantially correct instruction in writing"), *rev'd in part on other grounds*, 844 S.W.2d 198 (Tex.1992); *Tex. Gen. Indem. Co. v. More-*

*no*, 638 S.W.2d 908, 914 (Tex.App.-Houston [1st Dist.] 1982, no writ) ("Only if an instruction is omitted is a request a prerequisite to preserving the complaint."); *Lyles v. Tex. Employers' Ins. Ass'n*, 405 S.W.2d 725, 727 (Tex.Civ.App.-Waco 1966, writ ref'd n.r.e.) ("If the *definition* is *given*, but is claimed to be *defective*, under Rule 274 *objection* is the means of preserving the complaint.").

*Payne* speaks directly to this point. In *Payne*, the State complained about an erroneous multipart instruction on governmental liability for special defects that left out the requirement that plaintiff prove lack of knowledge of the special defect. 838 S.W.2d at 238–39. The State then submitted a question on lack of knowledge to bring its complaint about the instruction to the trial court's attention. Responding to the assertion that the State's request waived error because it could only preserve error by objecting to a defective instruction, we held that the State's request satisfied its obligation to object. *Id.* at 239.

It is also clear under Rule 278 that a party who complains on appeal that an instruction is entirely omitted from the jury charge must submit the requested instruction in writing and in substantially correct wording to the trial judge to preserve the point on appeal. Tex.R. Civ. P. 278; *Lyles*, 405 S.W.2d at 727. Rules 274 and 278 cannot both apply in this case.

An interpretation that a party who is not relying on an alleged defective instruction is required to adhere to Rule 278 and the Rule 276 submission and endorsement requisites conflicts with the language of Rule 274 and settled Rule 274 jurisprudence. Moreover, it makes no sense to erect a higher hurdle for a party who complains by written request to an instruction compared to one who simply verbalizes an objection on the record. Compliance with

Rule 276's endorsement requirements is not necessary for a written request in this situation. Rule 276 will continue to govern preservation of error for a party relying on requested definitions, questions, and instructions in a charge. Rule 274 governs preservation of charge error when the party's obligation is simply to object to a defective instruction, which he must do timely and plainly, and obtain a ruling. *See Texas Emp. Ins. Ass'n v. Mallard,* 143 Tex. 77, 182 S.W.2d 1000, 1002 (Tex.1944) ("[W]hen, as here, the court's charge does contain a definition, but some is unsatisfactory to the [complaining party], Rule 274 is applicable.").

In this matter, the instruction on procurement was neither relied on by First Valley, nor omitted from the trial court's charge. *See* TEX.R. CIV. P. 278. The bank asserted that it was defective. Therefore, First Valley's request is not subject to Rule 276. Instead, as the instruction was claimed to be defective, all that was required of First Valley was an objection. *See* TEX.R. CIV. P. 274; *Spencer,* 876 S.W.2d at 157 (holding that the applicable rule in this type case is Rule 274). The technical requirements of Rule 276 did not come into play.

The question remaining is whether First Valley's request serves as an adequate objection. I would hold that it does.

## V.

*Payne* rejects a formalistic reliance on the word "object" in Rule 274 and instead embraces the purpose of the rule, which is to make the trial court aware of the objectionable matter. *See Payne,* 838 S.W.2d at 240; *Alaniz v. Jones & Neuse,* 907 S.W.2d 450, 451–52 (Tex.1995) (per curiam).

The trial proceedings previously described are quite illuminating. They show that during the hearing on Martin's trial amendment, First Valley made the trial court aware of its opposition to any assertion of negligence as a basis for Martin's malicious prosecution claim, a position First Valley reasserted by submitting a procurement instruction that also rejected negligence as a basis for the tort. Further, the procurement instruction submitted to the jury by the trial court was a material deviation from First Valley's proposed instruction that would have been difficult to overlook. *See Browning–Ferris Indus. v. Lieck,* 881 S.W.2d 288, 293 (Tex.1994); *cf. Tex. Employers' Ins. Ass'n v. Jones,* 393 S.W.2d 305, 307–08 (Tex.1965) (noting that no difference between the trial court's definition and controlling authority was distinctly pointed out). And finally, the signature of the trial judge on First Valley's proposed charge, his bracketing the language of the disputed instruction in the bank's request and his noting that the instruction was modified indicates his rejection of First Valley's instruction in favor of the charge submitted. It can hardly be disputed that the trial court was aware of First Valley's complaint and the grounds for it, and that the court overruled the bank's complaint.

Under a common sense application of Rule 274, First Valley preserved its complaint that the trial court's instruction on procurement misstated the law. I would overrule *Hernandez* to the extent that any vestige of its statement that "[a] request for another charge is not a substitute for an objection" still casts a shadow over this issue. *See Hernandez,* 652 S.W.2d at 925.