Affirmed and Memorandum Opinion
filed January 27, 2011.

 

In
The

Fourteenth
Court of Appeals



NO. 14-09-00857-CV



Maria C.
Arrendondo, Appellant 

v.

Martin
Rodriguez and Lewis Food Town, Inc., Appellees 



On Appeal from
the 190th District Court

Harris County, Texas

Trial Court
Cause No. 2008-56560



 

MEMORANDUM OPINION 

            The
appellant, Maria C. Arrendondo, appeals the trial court’s grant of summary
judgment in favor of the appellees, Martin Rodriguez and Food Town, Inc., on
her malicious-prosecution claim against them.  In three issues, she contends
the evidence showed that Rodriguez, the manager of Food Town, initiated a
criminal prosecution against her knowing she was not involved in any criminal
activity, and that he acted without probable cause and with malice.  We affirm.




I

            On November
11, 2007, Maria Arrendondo was working as a cashier at Food Town.  Around lunch
time that day, Arrendondo took a break, and Yuri Mendez, another Food Town
employee, covered Arrendondo’s cashier station until Arrendondo returned. 
While Mendez was checking out groceries at Arrendondo’s station, a customer,
Maria Soto, got in line to check out there.  Before Soto reached the check-out
area, however, Arrendondo returned to her station.  Arrendondo began assisting
Soto, but Soto told Arrendondo she did not want all of the items in her cart.  Arrendondo
then rang up only the items Soto wanted and told Soto to push her cart
containing the other items forward, which was contrary to Arrendondo’s cashier training
and Food Town’s check-out protocol.  At that point, Arrendondo began assisting
the next customer and did not see what became of the cart or its contents.

            Another
cashier, Yesica Adame, whose station was next to Arrendondo’s, saw the
transaction with Soto and alerted Food Town management that a customer had
checked out at Arrendondo’s cashier station, but the majority of her grocery
items had not been rung up or even taken out of her grocery cart.  Rodriguez, who
was in charge of the store that day, obtained a copy of Soto’s receipt and reviewed
the surveillance video of the area.  In the video, Arrendondo appeared to “slide”
at least one item over the cashier counter without ringing it up.  

            Some time
after leaving Arrendondo’s station, Soto proceeded to get into Mendez’s check-out
lane where Mendez issued a fraudulent $50 refund to her, after which Soto
headed towards the store exit with her cart.  Rodriguez prevented Soto from
leaving and asked to see her receipt.  Although Soto had nineteen items worth about
$79 in her cart, her Food Town receipt showed that she had paid for only six
items worth about $8 when she checked out at Arrendondo’s station.  At this
point, Rodriguez believed that Arrendondo, Soto, and Mendez were all involved
in theft. 

            Rodriguez
questioned Arrendondo, Soto, and Mendez about their actions, but they provided
no satisfactory explanation.  Rodriguez asked Arrendondo about the
unpaid-for groceries in Soto’s cart, but Arrendondo said she did not know anything
about them.  Believing two crimes had been committed, Rodriguez called the
police.  Some time after the officers arrived, Rodriguez told the officers to
“take them,” presumably meaning to arrest Arrendondo, Soto, and Mendez.  Ultimately,
Arrendondo and Soto were arrested and taken into custody.  Mendez was cited for
misdemeanor theft and released.

            Arrendondo
never spoke with either of the two police officers who arrived at the scene,
and she did not hear any conversation between Rodriguez and the officers. According
to Arrendondo, after she and Soto were put in the patrol car, Soto told her
that she and Mendez had planned to commit theft and, when Rodriguez questioned
them, they told Rodriguez that Arrendondo was not involved, but Rodriguez told
them to incriminate Arrendondo.  

            Arrendondo and
Soto were both charged with theft.  Soto later pleaded guilty, but in 2008
Arrendondo was acquitted after a jury trial.  At the trial, Soto testified that
Arrendondo was innocent.  Arrendondo then filed this lawsuit against Rodriguez
and Food Town for malicious prosecution.

II

A

            Actions
for malicious prosecution create a tension between the societal interest in punishing
crimes and the individual interest in protection from unjustifiable criminal
prosecution.  Richey v. Brookshire Grocery Co., 952 S.W.2d 515, 520
(Tex. 1997).  There is little room for error in applying the law, as “[e]ven a
small departure from the exact prerequisites for liability may threaten the
delicate balance between protecting against wrongful prosecution and
encouraging reporting of criminal conduct.”  Browning-Ferris Indus., Inc. v.
Lieck, 881 S.W.2d 288, 291 (Tex. 1994).

            A
claim for malicious prosecution requires the plaintiff to prove that (1) a
criminal prosecution was commenced against her, (2) the defendants initiated or
procured the prosecution, (3) the prosecution terminated in her favor, (4) she
is innocent of the charges, (5) the defendants lacked probable cause to
initiate the prosecution, (6) the defendants acted with malice, and (7) she
suffered damages.  Kroger Tex. Ltd. P’ship v. Suberu, 216 S.W.3d 788,
792 n.3 (Tex. 2006); Richey, 952 S.W.2d at 517.  Rodriguez and Food Town
filed a summary-judgment motion on both traditional and no-evidence grounds asserting
there was no evidence on the elements of initiating or procuring Arrendondo’s
prosecution, probable cause, and malice.   

B

            After adequate time for discovery, a party may move
for summary judgment on the ground that there is no evidence of one or more
essential elements of a claim or defense on which an adverse party would have
the burden of proof at trial.  Tex. R. Civ. P. 166a(i).  Such a no-evidence motion
for summary judgment should be denied if the non-movant presents more than a
scintilla of probative evidence to raise a genuine issue of material fact on
the challenged element(s).  Forbes, Inc. v. Granada Biosciences, Inc.,
124 S.W.3d 167, 172 (Tex. 2003).  More than a scintilla of evidence exists when
reasonable and fair-minded individuals could differ in their conclusions.  Id. 
Less than a scintilla of probative evidence exists if the evidence creates no
more than a mere surmise or suspicion of fact regarding the challenged
element(s).  Id.          

       By comparison, a traditional summary-judgment movant bears
the burden to show that there is no genuine issue of material fact and that it
is entitled to judgment as a matter of law.  Tex. R. Civ. P. 166a(c); Nixon
v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985).  Thus, when a
defendant moves for traditional summary judgment, it must conclusively negate
at least one essential element of each of the plaintiff’s causes of action or
conclusively establish each element of an affirmative defense.  Sci. Spectrum,
Inc. v. Martinez, 941 S.W.2d 910, 911 (Tex. 1997).  Evidence may be said to
have been conclusively established when reasonable people could not differ in
their conclusions. City of Keller v. Wilson, 168 S.W.3d 802, 816 (Tex.
2005).  Once the movant establishes its right to summary judgment, the
non-movant must present evidence raising a genuine issue of material fact to
avoid entry of a summary judgment.  City of Houston v. Clear Creek Basin
Auth., 589 S.W.2d 671, 678 (Tex. 1979).  

       In reviewing either a
no-evidence or traditional summary-judgment motion, we must take as true all
evidence favorable to the non-movant and draw every reasonable inference and
resolve all doubts in favor of the non-movant.  Joe v. Two Thirty Nine Joint
Venture, 145 S.W.3d 150, 157 (Tex. 2004); Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 601 (Tex. 2004).

C

            Because
it is dispositive, we begin with Arrendondo’s second issue.  Arrendondo
contends Rodriguez had no probable cause to have Arrendondo arrested when there
was no evidence that Arrendondo had committed or participated in a crime, and Soto
and Mendez, the culpable parties, had told Rodriguez that Arrendondo was not
involved.[1] 


            Probable
cause is “‘the existence of such facts and circumstances as would excite belief
in a reasonable mind, acting on the facts within the knowledge of the . . .
[complainant], that the person charged was guilty of the crime for which he was
prosecuted.’”  Richey, 952 S.W.2d at 517 (quoting Akin v. Dahl,
661 S.W.2d 917, 921 (Tex. 1983)).  The question is whether a reasonable person
would believe that a crime had been committed, given the facts that the complainant,
before initiating the criminal proceedings, honestly and reasonably believed to
be true.  Id.  There is an initial presumption that the defendant acted
reasonably and in good faith and had probable cause to initiate the
proceedings.  Id.  That presumption disappears once a plaintiff produces
evidence that the motives, grounds, beliefs, and other evidence upon which the
defendant acted did not constitute probable cause.  Id. at 518.  The
burden then shifts to the defendant to offer proof of probable cause.  Id. 


            Once
a citizen has probable cause to report a crime, there can be no malicious
prosecution, even if the subsequent report fails to fully disclose all relevant
facts.  First Valley Bank of Los Fresnos v. Martin, 144 S.W.3d 466, 470
(Tex. 2004).  A private citizen has no duty to investigate a suspect’s alibi or
explanation before reporting a crime.  Suberu, 216 S.W.3d at 794.  If
the acts or omissions necessary to constitute a crime reasonably appear to have
been completed, a complainant’s failure to investigate does not negate probable
cause.  Id.  Further, although knowingly providing false information to
a public official may be relevant to the causation and malice elements of a
malicious-prosecution claim, it has no bearing on the element of probable
cause.  Richey, 952 S.W.2d at 519.  

            Rodriguez
testified that Arrendondo was detained both because she allowed Soto through the
check-out line with a large volume of unpaid-for goods and also appeared in the
surveillance video to “slide” a package of diapers over the counter without
ringing it up.[2] 
Rodriguez also explained the transaction in which Mendez made a fraudulent
refund to Soto of $50: 

 

Q.  So, [Soto]
went through [Arrendondo’s] line, what happened after that?

A.  She
went through the line.  She left some items in her basket, paid for some, but
didn’t pay for everything.

Q.  Okay.
And how do you know she didn’t pay for everything?

A.  We
pulled the transaction up on our computer to try to find her receipt and we
did.  And when she tried to exit the store, we stopped her and asked her for
her receipt and it didn’t match up with what she had in her basket.

. . .

Q.  Did you
approach [Arrendondo]?

A.  Yes, I
did.

Q.  And
what happened when you approached her?

A.  We
asked her to close her register and come to the manager’s office.

Q.  Okay.  At
this point, did you suspect her of theft?

A.  Yes.

. . .

Q.  So,
other than the sliding of the diapers, you have no knowledge that she actually stole,
correct, or slid anything across the conveyor belt, correct?

A.  She
didn’t have the customer take the item out of the basket.

Q.  Okay.
And did you ever do an investigation or ask her why she didn’t have the
customer take the items out?

A.  We asked
her about it after [Soto] tried to leave the store; so, we gathered up
everybody and, you know, no one could give us any kind of explanation as to why
the merchandise didn’t get rung up.  So, you know, we called the authorities at
that point.

. . .

Q.  Did [Arrendondo]
ever do anything like report that she made a mistake to you?

A.  No.

. . .

Q.  . . .
The time [Soto] went through [Mendez’s] line, at that time you made a
determination after the voided transaction that she was also in on it, correct?

A.  We
rounded everybody up, yes.

Q.  And it
was $71 split between the three of them, correct?

A.  I’m not
sure how that works.

Q.  How
much was the refund for?

A.  The
refund was a totally different transaction.  That was another $50 on top of the
$71.

Q.  Okay.  Now,
you testified earlier that [Soto] went through with the same basket?

A.  Correct.

Q.  So,
what did she refund?

A.  Nothing.
 It was a bogus refund.

 

            Thus, the appellees
presented evidence that they reasonably formed the belief that Arredondo participated
in the theft of groceries based on the video, the large number of items that
went through unchecked and without explanation, and Soto’s involvement in both
thefts.  Further, Arrendondo provided extensive testimony that Food Town policies
required all items to be taken out of the shopping cart, and it was against
Food Town’s policies to allow unchecked grocery items to be moved over to the
sacker side of the cashier lane or to allow customers to leave the point of
sale with unpaid-for groceries:

Q. . . .
Ms. Arredondo, as a cashier at Food Town, were you trained in how to do your
job?

A. Yes.
They gave me training for two days.

. . .

A.  All
right. Now, the cashier station, that’s what’s called the point of sale, the
area of sale; correct?

A.  Yes.

Q.  In
other words, it’s where the items which belong to Food Town are exchanged for
money and then they belong to the customers.

A.  Yes.

Q.  Okay.
Were you trained not to allow customers to leave the point of sale with unpaid
items?

A.  Yes.

. . .

Q.  As a
cashier, were you trained that you’re responsible for determining which items
are to be bagged and which items are not to be bagged?

A.  Yes.

. . . 

Q.  Were
you also trained that everything that a customer brings through your lane must
be taken out of the grocery cart?

A.  Yes.

Q.  And
were you trained that you have to pay special attention to the bottom of the
basket - - and this is why you were provided with the mirror and with the
see-through glass on the bottom; right?

A.  Correct.

. . . 

Q.  Okay.  Now,
were you trained at Food Town that the items which a customer rejected or did
not want for whatever reason were not to be sacked, were not to be bagged?

A.  Correct.

. . . 

Q.  All
right.  In your training at Food Town, were you instructed that when a customer
comes up and you are working with a sacker and a customer does not want certain
items, that you are to make sure that the sacker does not bag the rejected
items?

A.  Yes.

Q.  That is
a responsibility that you had as a cashier at Food Town; right?

A.  Yes.

. . . 

Q.  Okay.
Now, it’s not a sacker’s job to ring up the groceries or to figure out which
groceries have been rung up or not rung up, correct?  It’s the cashier’s job to
tell the sacker that.

A.  When we
have the sacker, yes.

. . . 

Q.  Do you
have a recollection, in your training at Food Town, of when a customer rejects
some items, to direct the customer to leave those items around your cashier
station?

A.  Yes.

. . .

Q.  Were
you trained that only checked items are allowed to be moved over to the sacker’s
side at Food Town?

A.  Yes.

. . .

Q.  Were
you trained that if a customer has some items in their cart that have not been
rung up, have not been paid for, and is trying to simply push them over to the
other side, that you should prevent that, that you should stop it?

A.  Correct.

. . .

Q.  Now, in
your training, was one of the things that you were trained not to do was mix
checked and unchecked items in the same cart?  Do you recall that?

A.  If I
was trained not to do that?

Q.  Correct.

A.  Yes.

. . . 

Q.  All
right.  What I asked you earlier is if a customer does end up with what you
noticed to be both paid-for and unpaid-for items in their shopping cart and
tries to go back into the store with the paid and unpaid items, were you trained
to prevent that by taking the items that had not been paid for away or
reporting a customer?

A.  The
customer cannot do that.

Q.  They
cannot go back into the store with both paid and unpaid items?

A.  No.  He cannot do that.

            By
Arrendondo’s own admission, her handling of the transaction with Soto at the
check-out station was completely contrary to Food Town’s policies and the
procedures Arrendondo had been taught during cashier training.  According to Arrendondo,
without any explanation, Soto refused to go through with the purchase of most
of the groceries Soto had selected and placed in her cart; in turn, Arrendondo
instructed Soto to push the cart full of unpaid-for items forward to the
sacker side.  Arrendondo adknowledged that, in doing so, she failed to keep the
unpaid-for items separate from the paid-for items, failed to instruct Soto to
leave the items, and failed to stop Soto from leaving with the unpaid-for items
in her cart:

Q.  Okay.  What
got this whole thing started was Yesica going to the management; right?

A.  Correct.

Q.  Okay.  And
what she testified to at trial and what we know today is that she went to the
management and she said: A customer just left Maria Arredondo’s station with a
bunch of her grocery items not even having been taken out of her basket.  Right?
 We know that today; correct?

A.  Yes,
now we know.

. . .

Q.  Okay.  And
Yesica Adame reported to management that in fact Maria Soto did leave your
cashier station with a vast majority of the grocery items not having been taken
out of the cart.  We know that today; right?

A.  Now we
know that, yes.

Q.  And
that was not inaccurate.  That was in fact what happened; right?

A.  What?

Q.  What
Yesica Adame told the management, what we just covered, that Maria Soto had
left your station with about $71 worth of unpaid items.

A.  Correct,
we know that.

. . .

Q.  All
right.  Now, today we know that a number of items stayed in Maria Soto’s cart;
right?

A.  Yes.  That
amount of items, Maria told me that she didn’t want them.

. . .

Q.  Okay.  So
you knew and you could see that there were items in Maria Soto’s basket that
were never taken out; correct? You knew that.

A.  Yes.

. . .

Q.  Now,
ultimately, what we know happened is that Maria Soto left your station with
both paid and unpaid-for items; correct?

A.  Yes.

. . .

Q.  Did you
ever ask Maria Soto to take those items and put them on the right side of your cashier
station?

A.  My
station?

Q.  Yes.

A.  No. I
just told her to push them forward.

. . .

Q.  I’d just
like you to answer my question if you can.  Do you have a recollection of doing
anything specific that you can point me to on that day when Maria Soto was
leaving your cashier station to make sure that the paid and unpaid items were
kept separate?

A.  No, I
don’t recall.

Q.  Regardless
of what items may have been bagged that day and what items were not bagged that
day, do you recall doing anything specific that day to make sure that the
sacker who showed up to your station did not bag the rejected items; such as
telling him not to do that, or doing anything else that you can remember?

A.  What
happened is that when Maria said good-bye, I did not check what the sacker had
done, because I started taking care of the next customer.

. . .

Q.  When
Maria Soto was leaving your station, was it your belief that she had left the
unpaid-for items somewhere other than taking them with her?

A.  Correct.
 That she had left the basket there.

Q.  Did you
ever look around to ensure that in fact she did leave the portion of her
unwanted groceries somewhere around your station?

A.  No.  I’m
not checking where people leave the items.  I’m at my station, my cashier,
taking care of my customers.

. . . 

Q.  Okay.  Now,
do you have any recollection what happened to the unpaid items that remained in
her basket?  Do you recall whether the sacker bagged those or not?  Do you have
a recollection one way or another?

A.  No, I don’t recall.  I did not see.

            Soto testified that the
unpaid items were not only left in her cart, but also were bagged up at Arrendondo’s
station:

Q.  What
did you do with the basket?

A.  I put
it over there and somebody pulled it close to the wall on opposite her side.

Q.  And did
the basket still have items in it?

A.  The
bagger approached and he began bagging the items that I didn’t want, the ones I
had with Maria Arrendondo.  And neither she nor I did we notice that the bagger
was bagging the items that I did not want.  So, I only noticed when he bagged
the W.I.C. items and I got the basket and went to the taqueria.

 

            When
Soto attempted to leave with the unpaid-for groceries, the appellees had a firm
basis to form a reasonable belief—based on the quantity of goods and disregard
of store protocol—that Arredondo had assisted in the theft of the groceries in
Soto’s cart.  Moreover, Rodriguez questioned Arredondo regarding the unpaid-for
groceries, but she provided no explanation, and stated only that she knew nothing
about the situation.  Arredondo also testified that she did not know what
Rodriguez said to the police officers who arrived at the store and the officers
did not question her there: 

Q.  All
right. Now, you’re saying there were - - there were two officers from the
Sheriff’s Department there?

A.  Yes.

Q. All
right.  One was already in the office and you're saying the other one was just
coming in?

A.  Yes.

. . .

Q.  . . .
Okay, Ms. Arredondo, I was asking you about conversations that you overheard Martin
Rodriguez having with other people.  Do you recall anything that was said
specifically between Martin and anybody else in that office?

A.  No, I
don’t recall.

. . .

Q.  You
never had any conversations, as best as you can recall, never exchanged any
words with any of the police officers there; is that correct?

A.  No.

Q.  Is that
a true statement?

A.  I don’t
know.

A.  It’s a
bad question.  I’m sorry.  What I said earlier about you not talking to the
police, was that correct?

A.  It’s
correct.

 

            Likewise, in her trial
testimony, Arredondo testified that she neither talked with the police nor
provided any explanation about this incident:

Q.  And did
the police officer talk to you?

A.  Not at
all.

Q.  Did the
police officer speak Spanish?

A.  Neither
one of them did.

Q.  Did
they ever ask you for your side of the story?

A.  When I go to the office where [Soto] and [Mendez] were,
I was asked what happened to those products.  And I told them that I didn't
know anything about it.

            Arrendondo
also admitted that when appellees called the police she did not believe that they
were motivated by anything other than a reasonable belief that crimes had been
committed on the premises:

Q.  Okay. 
Based on your involvement in the case, your involvement in your criminal trial and
all the testimony in it, based on the documentation that you’ve seen in this
case, do you believe that Food Town employees called out the police for some
other reason than the fact that they believed that two crimes had occurred on
the premises?

A.  No.

And based
on your involvement in this case and the underlying prosecution and all the
documents that you’ve seen so far, do you believe that Martin Rodriguez
detained you for some other reason that honestly believing that you may have
been involved in a crime?

A.  No.  

 

            On
appeal, however, Arrendondo contends that Rodriguez lacked probable cause
because he allegedly failed to inform the police that Mendez was at
Arrendondo’s cashier station when Soto got in line to check out there, and Soto
and Mendez told Rodriguez that Arrendondo was innocent.  Accepting these contentions
as true, they do not negate the existence of probable cause to report the
suspected criminal activity.  See Suberu, 216 S.W.3d at 795; Martin,
144 S.W.3d at 470.[3] 
Whether Soto had planned to commit a theft with Mendez when she got in
Arrendondo’s check-out line is irrelevant because Soto did, in fact, check out
with Arrendondo, who admits she allowed Soto to go through the line without
paying for the majority of the items she had placed in her cart.  And, although
Soto and Mendez may have maintained to Rodriguez that Arrendondo was not
involved, Rodriguez had independent, objective evidence that would lead a
reasonable person to believe that Arrendondo was complicit in the thefts,
regardless of the statements Soto and Mendez made when they were questioned,
and Rodriguez had no duty to investigate or inquire further into Arrendondo’s state
of mind before reporting the suspected criminal activity.  See Richey,
952 S.W.2d at 518 (holding that, even if intent cannot be presumed, probable
cause exists when the objective elements of a crime reasonably appear to have
been completed).  

            Thus,
the undisputed evidence conclusively shows that appellees had probable cause to
 initiate or procure the prosecution of Arrendondo: (1) Food Town employees saw
Arrendondo allow Soto to pass through her check-out line without paying for
most of the items in her cart in a manner that was completely contrary to
Arrendondo’s training and store policy; (2) Arrendondo admitted that she knew Soto
had not paid for all the items in her cart when she passed through to exit Arrendondo’s
check-out line; and (3) Arrendondo agreed that Rodriguez and Food Town
reasonably believed that she may have been involved in a crime.  Therefore, the
appellees were entitled to summary judgment on Arrendondo’s malicious-prosecution
claim.  See Richey, 952 S.W.2d at 518–20, see also Summervile
v. Allied Barton Sec. Servs., 248 S.W.3d 333, 339 (Tex. App.—Houston [1st
Dist.] 2007, no pet.) (affirming summary judgment for store when appellant
contended his arrest was motivated by racial profiling but undisputed evidence
showed that he committed trespass).

            We
overrule Arrendondo’s second issue and do not reach her first or third issues.

*
* *

            The
trial court’s judgment is affirmed. 

                                                                                    

                                                                        /s/        Jeffrey
V. Brown

                                                                                    Justice

 

Panel consists of Justices Anderson,
Frost, and Brown.









[1]
The record shows that this evidence is based on Arrendondo’s testimony that
Soto told her that Soto and Mendez told Rodriguez that Arrendondo had nothing
to do with the crime and that Rodriguez told them to blame Arrendondo. 
Although the appellees objected below to this evidence as hearsay, the record
does not show that they obtained a ruling or that the trial court refused to
rule on their objections.  See Tex. R. App. P. 33.1(a).  Nor is the
trial court’s order specific enough to indicate an implied ruling on the
appellees’ objections to evidence.  See U.S. Bank Nat’l Ass’n v. Stanley,
297 S.W.3d 815, 821 n.8 (Tex. App.—Houston [14th Dist.] 2009, no pet.). 
Further, the appellees do not contend on appeal that this evidence is hearsay
or otherwise incompetent.  Therefore, the testimony remains a part of the
summary-judgment evidence.  





[2]
Rodriguez testified that “sliding” refers to a cashier “ringing out an order
but not really scanning everything.  





[3]
Further, Arrendondo’s contention that Rodriguez acted with malice when he
allegedly told Soto and Mendez to blame Arrendondo is not relevant to the
existence of probable cause.  See Martin, 144 S.W.3d at 470; Richey,
952 S.W.2d at 519.