

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-20-00177-CV

_____

CYNTHIA ANN MITSCH BEARDEN, Appellant

V.

JARED LECLAIR, Appellee

---

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CV12-00219

---

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

### Introduction

Two horses and three people—Appellant Cynthia Ann Mitsch Bearden, Appellee Jared Leclair, and Dr. Daniel Dugan—are in the center ring of this case. In late 2011, Leclair was stabling and training horses for clients that included Bearden and Dugan. Leclair and Dugan were also horse-investment partners but soon to be on the outs when, through Leclair as agent, Bearden bought Dugan's horse Electric Surge. Intrigue and complications that included the untimely death of another horse, Topper, led Bearden and Dugan to collaborate on Bearden's procuring a felony-theft indictment against Leclair over the money Bearden had paid for Electric Surge. After the Cooke County D.A.'s office later read messages between Bearden and Dugan, the indictment was dismissed and Leclair's records expunged.

Leclair sued Bearden, and a jury found that Bearden had maliciously prosecuted Leclair and defamed him by publishing statements online accusing him of engaging in theft, misappropriating client property, and being dishonest in business dealings. The trial court entered judgment awarding Leclair over $1 million in actual and exemplary damages. Bearden has appealed, raising evidentiary-sufficiency and excessive-damages issues. We will affirm.

### I. Parties Involved

*Jared Leclair*: Professional horse trainer and rider; owns and operates a training and boarding facility in Gainesville called Leclair Reining Horses (formerly Leclair

Performance Horses, or LPH); in late 2011 was in financial straits and going through a contentious divorce from then-wife Heather.

*Cynthia Ann Mitsch ("Cam") Bearden*: Amateur horse enthusiast from childhood; in 2007, began riding competitively in her chosen discipline, reining,[1] after a many-year hiatus to raise her children; was a client of LPH from 2008 until 2012, participating in roughly a dozen shows a year; between 2009 and 2012, spent well over $350,000 buying several horses, including Electric Surge (Surge), from Leclair.

*Daniel Dugan, D.D.S.*: Another of LPH's long-time clients and a 50% partner in L&D Partnership—formed in March 2009 to breed, promote, train, and show reining horses—along with Leclair, Heather, and, later, a fourth person who does not figure into this case; in November 2011 was in financial difficulty himself and owed LPH over $100,000; not a party to this appeal.[2]

*Scott Rodgers (deceased)*: Yet another LPH client; in Spring 2012 was briefly aligned with Dugan and Bearden.[3]

---

[1]Reining is a discipline in which riders guide horses through a series of highly detailed patterns. *See* Jon D.B., *Here's What Goes Into All of Those 'Yellowstone' Horse Reining Scenes*, Outsider (Dec. 2, 2021, 5:01 PM), https://outsider.com/entertainment/tv/yellowstone/reining-horse-scenes-yellowstone-explained/ (describing the "baffling equine maneuvers" in the Paramount television series *Yellowstone*).

[2]Dugan and Leclair settled their disputes in 2013, and Dugan received a favorable jury verdict and judgment on Bearden's third-party fraud claim against him.

[3]Bearden had a similarly unsuccessful third-party fraud claim against Rodgers, who died before trial. Bearden has not appealed the outcome of any of her affirmative claims.

## II. Factual Background

The reining-horse world is "tight-knit," and Cooke County is the epicenter of that world. Leclair was close, personally, with both Bearden and Dugan, and Bearden and Dugan themselves became friends through reining competitions and having horses in Leclair's facilities, where they would see each other regularly.

### A. L&D Partnership begins unwinding; Dugan authorizes Surge's sale.

Because of Dugan's and Leclair's respective financial hardships and the Leclairs' pending divorce, in late 2011 Dugan and Leclair began discussing how to dissolve L&D. In a series of text exchanges on November 14, 2011, Leclair mentioned that he might have to sell Topper, a partnership horse, because of Leclair's mounting bills. Dugan responded, "What ever u have to do" and also authorized Leclair to sell Surge ("It's a business decision. From my standpoint u can sell Electric Surge as well to get what u need. I understand. It's business").[4]

In this same text thread, Dugan reiterated that he knew it was just "business"; that he trusted Leclair and loved him "like a son"; and that from the start, Leclair had "absolute total control of the buy or sell process as well as the partnerships." Dugan also wrote, "I want to make things a[s] easy for u as possible. If I walk away today, my credit card has an 18.5k balance and what I owe u. If those balances are paid, I can resign from partnership and financial obligations and you would [be] free to negotiate

---

[4]Dugan had bought Surge only a month earlier, charging a credit card the $18,500 purchase price because he "did not have the money."

with Heather." Leclair testified that Dugan knew that Leclair needed the money and told him to credit Dugan's outstanding bill to LPH, a common practice among trainers and clients and something that Leclair had done previously with Dugan.

**B. Bearden buys Surge.**

Leclair had occasionally arranged for Bearden to buy other of Dugan's horses in the past. In December 2011, Leclair suggested that nearly two-year-old Surge would be a "good fit" for Bearden, and she agreed to buy him for $18,500. Bearden knew that Dugan owned Surge.

For tax reasons, the transaction was to be effective January 1, 2012, and because Bearden needed to transfer some money to cover the purchase price, in December 2011 she gave Leclair two post-dated checks, one dated January 2 and the other January 4. Leclair told Dugan in December that he had sold Surge to Bearden, and Leclair considered the sale to have concluded then through a verbal contract with Bearden. Bearden had no discussions directly with Dugan, a situation she described as "typical" when a trainer is brokering a sale.

After January 1, Surge's recurring monthly charges were switched out of Dugan's LPH account and into Bearden's, and Bearden obtained equine insurance on Surge with an effective date of January 1, 2012. On the signed application, which was dated January 1, 2012, she put "Dugan" in the "purchased from" box and "01/01/2012" as the purchase date. Bearden also gave the insurance company a signed "statement of health" dated January 1, 2012, showing that she owned Surge.

Dugan never complained about the billing switch, nor did he ever demand that Leclair—or Bearden—return Surge to him. Likewise, between January and May, Bearden never asked Dugan for anything related to the horse.

LPH's February 2012 billing statement to Dugan applied the $18,500 credit for Surge's sale as Dugan and Leclair had earlier agreed, leaving Dugan with a balance due of some $85,000.

### C. Topper's training accident and death; insurance dispute.

In the meantime, later in December 2011, Topper died while being trained, triggering a dispute between Leclair and Dugan over how to handle the proceeds of Topper's $37,500 insurance policy and complicating the monetary aspects of their partnership dissolution.[5]

On January 3, 2012, Dugan texted Leclair:

Jared[,] didn't get much time to talk to u yesterday but wanted to make sure before we complete the sale of Surge and deposit monies that we had some definite numbers that we all agree to especially with respect to the recent loss of Topper and his value. This would help me tremendously in making some decisions that will affect u and Heather long term.

The next day, January 4, Leclair deposited Bearden's two checks and used the money to pay some of his bills, as he and Dugan had previously discussed. Leclair did not

---

[5]Leclair acknowledged that he deposited the insurance money into his LPH business account and that Dugan had wanted that $37,500 as part of the partnership dissolution.

interpret Dugan's text as withdrawing authority to sell Surge, especially since Dugan knew in December 2011 that Bearden had bought him.

Also in January, Dugan told Leclair—after Bearden's checks were deposited and she had possession—that he would not give Surge's "papers"[6] to Leclair until after they dissolved the L&D partnership. Leclair relayed that to Bearden, and she had no problem with the delay: it "wasn't a big deal, the horse is a two-year-old, it wasn't going to get shown for a year and a half, and she didn't [yet] need the papers." From that point until the middle of April, the parties' relationship rocked along as it had.

**D. Debacle at a major horse show.**

The annual National Reining Breeders Classic (NRBC) in Katy, Texas, is one of reining's major competitions. Up until the mid-April 2012 NRBC, Bearden had referred to Leclair as "like a son" to her, even occasionally lending him money. But after that competition, their relationship changed "drastically."

Bearden was riding one of her horses in a higher class of the competition than she was accustomed to—Leclair compared it to going from playing high-school

---

[6]The American Quarter Horse Association, or AQHA, maintains ownership records, and when a horse is sold, the owner–seller provides the buyer (or an intermediary) with the papers—proof of the seller's ownership—and a transfer form is sent in to AQHA to show the change in record title. If for some reason a seller does not provide papers, the AQHA has a system by which the new owner can get the horse registered in his or her name. ("[Y]ou can send your canceled checks to the [AQHA] and they will start a process to get you paperwork.") Bearden knew about but never initiated that process with the AQHA, nor did she ever ask for Surge's papers between January and May 2012.

football to college football—and performed poorly enough to score a zero. Sean Johnson, another trainer, witnessed the event and opined that Bearden "acted very nervous showing that horse." Johnson did not recall if Bearden had not previously shown at a competition as large as the NRBC, "but it certainly did come across that way"; such shows involve "a lot pressure and a lot of nerves."

Right after her score, Bearden made it publicly known that she was very upset, and she acknowledged that her conduct had upset others at the show. Johnson overheard a "fair amount of yelling and crying to the point where [Leclair] tried to explain what happened, as they were watching the video [of her ride]. And, ultimately, he kind of had to walk away." Leclair described Bearden as "really, really, really mad"; she blamed him for what she considered an improperly trained horse, in contrast to both Leclair's and Johnson's views that the horse was prepared.[7] According to Leclair, Bearden went on to say "negative things" about him at the show.

After the NRBC, Leclair mentioned to others that he might have to ask Bearden to leave his barn and find another trainer, which Bearden characterized as making her feel "hurt." Leclair said that when she contacted him after learning of that possibility, she "scream[ed]" at him.

---

[7]Bearden conceded that she received a zero because she had put two hands on the reins but testified that the horse "ran off with" her so that it took both hands to stop him. Johnson disagreed that the horse had run off with her but explained that using two hands in reining results in a zero score.

**E. Aftermath of the NRBC: Bearden and Dugan make a secret deal.**

In late April 2012, Heather Leclair—still going through the nasty divorce—and Dugan's girlfriend, Nanette Combs, both reached out to Bearden and encouraged her to contact Dugan to get his "insight" and "clarity." When Bearden and Dugan spoke several days later, Dugan (according to Bearden) told her that Leclair had not had his permission to sell Surge. But Dugan also purportedly told Bearden that he would give her the papers as soon as Leclair paid him the $18,500 and also "some insurance proceeds"—the $37,500 on Topper's life.

Bearden agreed that on April 28, 2012, she and Dugan made "a secret side agreement." In a text exchange early that morning, Dugan wrote, "I will do what I have to make that transaction a positive, but do not tell anyone. It [is] a trump I have with [Leclair]." Bearden texted, "No worries I'm totally with ya!"

At trial, Bearden first said that these texts referred simply to the fact that if Dugan "got the money from Mr. Leclair for the horse, [she] would get the papers," although she could not explain why that would be a secret. Bearden later referred to Topper's insurance proceeds as a second component and agreed that she "knew that Danny Dugan wanted to get more than just the money for Electric Surge from Jared Leclair."[8]

---

[8]After Bearden became his "trump," Dugan increased his demands. He acknowledged that he had "wanted to do whatever it took," "[w]hether it was criminal, civil," to get his money.

Bearden discussed the situation with trainer Sean Johnson. According to him, Bearden said that she had bought Surge, that Dugan had the papers, and that Leclair had acted wrongly by not paying the $18,500 over to Dugan. Johnson did not know at the time that Leclair had credited Dugan's bill by that amount, but based on what Bearden told him, he texted her on May 3—the same day she moved her horses out of Leclair's facility[9]—that Leclair might have committed a crime. Bearden texted back, "All ok with [Dugan] but still his 'trump card' in the lawsuit against Jared- it's gonna get real ugly."[10]

From previous conversations, Johnson understood Bearden to be referring to a deal between her and Dugan for her to be a criminal complainant against Leclair. Johnson also understood that the arrangement between Bearden and Dugan was for Dugan to keep Surge's papers in his name until his civil case against Leclair was over.

---

[9]Bearden texted Dugan on May 4 that Leclair had "had the nerve" to ask her to pay her final bill to LPH before moving her horses and that she "went off on him! Should be interesting when I ask for horse papers." Bearden initially moved her horses to Tim McQuay's barn, but in early July 2012 she switched to Johnson's, remaining there for only about six months. Both moves occurred without Bearden's needing Surge's papers.

[10]Dugan sued Leclair on May 22, 2012, for breach of the partnership agreement and other causes of action arising, in part, from Dugan's position that Leclair owed him Topper's insurance proceeds as well as the proceeds from selling Surge. In September 2012, while that litigation was ongoing, Dugan simply gave Bearden Surge's papers because she needed them to have the horse gelded at Johnson's, and Dugan also signed the AQHA transfer form; it showed January 10, 2012 as the sale date.

Bearden agreed that she had "told Sean Johnson about this whole scare tactic vendetta, and he said, well, in that case, don't put those papers in your name."

Bearden told Johnson that she knew that Leclair was authorized to sell the horse but still intended to make a criminal complaint against him. As for Bearden's opinion that Leclair's malfeasance had consisted of taking her checks but not paying Dugan in turn, Johnson thought it made no sense for *Bearden* to accuse Leclair of "horse theft": "[Leclair] never stole a horse from her. So if anything, according to the story I got, the horse, to me had been stolen from [Dugan]. So it should have been [Dugan] making the criminal accusations."

Johnson's overall impression was that Bearden was "mad" at Leclair and "wanted to punish" him.

**F. Bearden pressures Leclair.**

On May 4, 2012—the day after telling Johnson about her "trump card" deal with Dugan—Bearden texted Leclair: "Where are papers on Surge?" Bearden continued: "you sold me the horse and I want the papers!"; "If [Dugan] still has papers you need to talk to him"; and "Whatever is going on between you and [Dugan] does not involve me so you best do whatever it takes to get me those papers very soon." This was her first-ever written demand for papers.

On May 7, she wrote, "If I do not have a bill of sale today by 4:00 I will contact my attorney, sheriffs, NRHA & AQHA- this can get very nasty if that is what you wish- I do believe it is called FRAUD."

11

On May 8, Bearden continued, demanding the papers "no later than Wed. I do not want to pursue legal action against you as it will be very ugly. Rest assured I will do whatever it takes to get my property"; the "bottom line is you sold me a horse that you were told not to sell." Leclair explained, "I told [Dugan] I was selling [Surge] to you [J]an first because of tax reasons the deal was done then he told me he didn't want to sell anything I told he [sic] after my divorce I would give him the money back[11] . . . he knew the horse was being sold to go towards his bill I told you that." Leclair's text also raised a question: "[W]hy would I sell you a horse . . . that wasn't for sale to [someone who] was my best customer that doesn't make sense."

Leclair offered to give Bearden her money back, but Bearden responded that she would "not accept that money, I bought a horse and I want the horse and I will get it some how" and added, "Do not attempt to give me $$$ for [S]urge."[12] Also on May 8, Bearden's lawyer wrote a demand letter to Leclair that read in part:

> Ms. Bearden has not received the AQHA Registration Papers for the colt. *She has now learned that the colt's registered owner is Daniel Dugan.* Mr. Dugan asserts he has not received payment for purchase of the horse.

---

[11]This was a reference to a proposal that had evolved for all the partnership horses to go into Leclair's divorce, and once the divorce was final, because Dugan still had a credit-card balance on Surge, Leclair could then raise money (presumably by selling some horses) and pay Dugan $18,500. Leclair agreed that this differed from the initial deal to credit Dugan's outstanding LPH bill, which Leclair did in January 2012, and that it was inconsistent—"[p]aying him back wasn't the right choice of words."

[12]Bearden could not explain at trial why she did not simply take the $18,500 from Leclair and pay it over to Dugan if that was truly the holdup on getting the papers.

> This is a formal demand to you individually, to secure the necessary AQHA Registration Papers for Electric Surge and provide them to Ms. Bearden within twenty-one (21) days from the date of this letter. Your failure to deliver the documents or [to make] satisfactory arrangements for Ms. Bearden to[ ] obtain the documents will result in all appropriate legal recourse available on Ms. Bearden's behalf. [Emphasis added.]

Bearden knew that Leclair could not comply with that demand without Dugan's cooperation. For Dugan's part, he wrote Heather on May 9, copying Bearden, to lay out expanded details of everything he expected to receive from the partnership dissolution and his "plan to continue with a strong arm of legal confrontation as discussed." Bearden assured him that she was "in all the way, whatever it takes."

On May 10, Bearden texted Dugan that Leclair "best get you that 50k really soon!" and texted Rodgers that Leclair "needs to be aware that on day 22 unless [Dugan] has 50k"—obviously not just Surge's $18,500—"I am going straight to DA's office." Day 22 after the demand letter would have been May 30, 2012.

But Bearden moved proactively, texting Dugan on May 14 that the two of them should meet with the Cooke County District Attorney to "lay the ground work" before the demand-letter deadline; Bearden viewed the DA as "the scare tactic for sure." Dugan agreed, and Bearden arranged for them to meet on May 16 with DA Janice Warder, who included Assistant DA Ron Poole in their meeting. Based on Bearden's and Dugan's story—that Leclair had sold Surge to Bearden for $18,500 but did not own the horse and did not give Bearden the papers, and that Leclair did not

13

have Dugan's permission to sell Surge—Poole presented a case for felony theft to the Cooke County grand jury a week later.

### G. Bearden testifies before the grand jury; Leclair is indicted.

On May 23, 2012, Bearden was the sole grand-jury witness. She testified that she had bought the horse from Leclair "on, like, January the second," then "fast forward to April," when she learned that "the horse was truly not for sale, and was not his to sell." She "first discover[ed] . . . that Jared Leclair did not have authority to sell" the horse "around the first part of May" and she "had a conversation with the owner -- the actual owner-of-record of the horse." Bearden told the grand jury that Leclair "knew that Dugan was the owner," and Leclair had "sold [her] a horse that didn't belong to him." Bearden had "possession of the horse," but "not a title." A grand juror asked, "And the original owner wants his horse back?" to which Bearden responded, "Yes. Exactly."[13]

The grand jury returned an indictment for a state-jail-felony offense, charging that Leclair had "intentionally or knowingly, with intent to deprive Cynthia Bearden, the owner of property, acquired or otherwise exercised control over current money of the United States of America, without the owner's effective consent, and the value of the property stolen was $1500 or more, but less than $20,000." *See* Tex. Penal Code

---

[13]Johnson testified that all of this grand-jury testimony was "inconsistent" with what Bearden had told him. At trial, Bearden conceded that Dugan had never done anything inconsistent with her owning Surge.

14

Ann. § 31.03(e)(4).[14] A warrant was issued for Leclair's arrest shortly afterward. He turned himself in, was handcuffed and booked, spent four hours of a night in jail, and was released after posting bond.

When the local newspaper reported the story, Bearden texted Johnson: "Seems that Superstar made the Gainesville paper and not in a good way- not sure of details but it's in there!"

### H. Bearden has a question planted—and answers it—in an online reining forum.

Before the sun came up the day after her grand-jury testimony, Bearden sought an invitation to join a reining-community Facebook group. She got the ball rolling by texting Joe Curtis, a friend and silversmith whose business Bearden patronized: "So how do I go on the site, is it on Facebook?" This was two minutes after texting Dugan, "I will sleep well tonight!! It's done now let's see the snake slither!!!" Curtis then spoke with Paula Parkhill, also involved with reining, and the two of them invited Bearden to the group.

Admittedly because she wanted to get the story out on social media, Bearden agreed that she "pre-arranged" to have Parkhill pose a question to the forum: "Has anyone had a trainer steal from you or sell your horse and then not pay you for it?" That allowed Bearden to weigh in: "For the record Paula this exact thing has recently

---

[14]The statute's current range is between $2,500 and $30,000. A person convicted of a state-jail felony can be imprisoned for between 180 days and two years and fined up to $10,000. *See* Tex. Penal Code Ann. § 12.35(a), (b).

happened to me"—her "X trainer Jared Leclair sold me a horse that he was absolutely told NOT to sell by the owner and his business partner"; she had "given him every opportunity to make this right but to no avail"; and she "[h]ate[d] to air dirty laundry here but feel as though the industry should be aware as to the 'dirty dealers' out there." She added, "And obviously Mr. Leclair has yet to pay the owner the money I gave him for the horse!"[15]

In response to a sympathetic question, Bearden assured the forum's readers that she had her canceled check and "ha[d] contacted the owner who will upon receiving the funds for the horse I purchased along with insurance funds on a horse that was killed he will release papers to me. It is going to be an ugly legal battle for us all. Hard to believe someone would do all this to their very best customers!!"

As with Bearden's grand-jury appearance, this orchestrated Q&A took place before the demand letter's deadline.

### I. After reviewing Bearden's and Dugan's texts, the DA's office dismisses the indictment.

At their initial May 16 meeting, Poole had asked Bearden and Dugan to provide their cell phones for review because Bearden had mentioned some pertinent text exchanges with Leclair. After Poole later saw certain texts and met with Leclair's

---

[15]Bearden's post came two weeks after Leclair reminded her that Dugan "knew the horse was being sold to go towards his bill[;] I told you that." Bearden acknowledged at trial that she knew at that time that Dugan and Leclair were involved in a partnership dispute and that she didn't know which of them owed the other money.

defense attorney, Poole concluded that he and the grand jury had not been told the truth. On July 2, 2012, Poole moved to dismiss the charges; he also had Leclair's records expunged.

Around this time, Bearden was moving her horses from McQuay's to Johnson's and—anticipating that Leclair would sue her—told Johnson that "she may have to sue [Dugan] to make it look right."[16]

The Cooke County DA's office considered filing aggravated-perjury charges against Bearden but for various reasons ultimately decided not to.

### III. Procedural Background

This case began on May 22, 2012, when Dugan sued Leclair the day before Bearden's grand-jury testimony. By the time it was tried in October 2019, parties and causes of action had been rearranged and distilled into (1) Leclair's claims against Bearden for malicious prosecution and defamation and (2) Bearden's third-party fraud claims against Dugan and Rodgers. The jury found in Leclair's favor on his claims and against Bearden on hers. The jury assessed malicious-prosecution damages totaling

---

[16]Even though Bearden's trial theory against Dugan was that he had lied and misled her into initiating criminal proceedings against Leclair by not telling her of his November 2011 authorization to sell Surge, Bearden and Dugan stayed united in their goal of destroying Leclair even after the indictment was dismissed. (Bearden to Dugan on July 3: "Please please Danny don't weaken on your suit with him- stay strong and carry on!!") Bearden was greatly upset, not with Dugan but with the DA's dismissing the indictment, telling Dugan on July 8 that she felt "grossly misle[d] by them." In late August, Dugan texted her about an attorney who had "agreed to fight Mr. Leclair for us." Bearden sued Dugan only after Leclair had sued her.

$659,855 ($9,855 for defending the criminal charge, $500,000 in past mental anguish, and $150,000 for reputational harm); $50,000 for reputational harm from Bearden's defamation; and $500,000 in exemplary damages for malicious prosecution.[17]

After applying a $15,000 Dugan-related settlement credit, the trial court entered judgment in February 2020 awarding Leclair $694,855 in actual damages and $500,000 in exemplary damages. Bearden posted a cash bond, and this appeal followed.

## IV. Issues

Bearden raises four issues, which we paraphrase:

- Leclair did not rebut the presumption that Bearden had probable cause to initiate criminal proceedings, but if he did, the evidence conclusively proved that she did have probable cause.

- The evidence was insufficient to support one element of defamation liability: whether Bearden "negligently published a defamatory statement"—that is, whether Bearden "knew or should have known" that her statements accusing Leclair of engaging in theft, misappropriating client property, and being dishonest in his business dealings were false and potentially defamatory.

- The evidence was insufficient to support compensable reputation and mental-anguish damages, but if sufficient, the jury's awards were excessive.

- If we suggest a remittitur of the damages amounts, the $500,000 exemplary-damage award should in turn be reevaluated.

_____

[17]Leclair had asked the jury for $2 million for mental anguish and $1.5 million for reputational harm.

## V. Standards of Review

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when, among other things, the evidence offered to prove a vital fact is no more than a mere scintilla, or the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining legal sufficiency, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient, we set aside the challenged finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). This review is not as restrictive in scope as a legal-sufficiency review, but remains deferential to found facts that are supported by the weight of the evidence. *Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010); *Bellefonte*

19

*Underwriters Ins. Co. v. Brown*, 704 S.W.2d 742, 744–45 (Tex. 1986). "When evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies, and as a general proposition, the jury may believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness." *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (cleaned up).

## VI. Malicious Prosecution: Probable Cause

Of the several elements of a malicious-prosecution claim,[18] Bearden challenges only whether she lacked probable cause to initiate criminal proceedings against Leclair for felony theft of her money. She argues that Leclair failed to overcome the legal presumption of probable cause and that, even if he did, her probable cause was conclusively established as a matter of law.

By its verdict, the jury found—along with the other elements—that Bearden did not have probable cause, and we agree.

### A. Applicable legal principles

The jury was instructed that "the probable[-]cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal

---

[18]A plaintiff must establish (1) that a criminal prosecution was commenced against him, (2) that the defendant initiated or procured it, (3) that the prosecution terminated in the plaintiff's favor, (4) his innocence, (5) the absence of probable cause for the proceedings, (6) the defendant's malice in filing the charge, and (7) damage to the plaintiff. *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997).

proceedings were instituted." *See Richey*, 952 S.W.2d at 517. To foster society's interest in encouraging citizens to report crimes, real or imagined, courts "must presume that the defendant acted reasonably and had probable cause to initiate criminal proceedings." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). Rebutting this presumption requires the plaintiff to produce evidence that other information or motives upon which the defendant acted undercut probable cause— that is, that some information or motives "demonstrate that [the defendant] did not reasonably believe [the plaintiff] was guilty of" the crime charged. *Id.* at 794– 95 ("Suberu was required to produce evidence that Kroger initiated her prosecution on the basis of information or motives that do not support a reasonable belief that she was guilty of shoplifting."). With such evidence, the presumption "disappears," and the burden shifts to the defendant to prove probable cause. *Akin v. Dahl*, 661 S.W.2d 917, 920 (Tex. 1983). The "critical question" is the complainant's state of mind. *Suberu*, 216 S.W.3d at 795.

Events occurring—or information obtained—after a prosecution is initiated are irrelevant to the probable-cause inquiry. *Akin*, 661 S.W.2d at 920 (holding that "only" existing events matter in determining probable cause); *Digby v. Tex. Bank*, 943 S.W.2d 914, 921 (Tex. App.—El Paso 1997, writ denied) ("Texas courts have consistently held that probable cause should be evaluated *from the perspective of the person or entity who made the report* to law enforcement authorities, *at the time* that the report was made."). Additionally, although a malicious-prosecution defendant's failure to disclose all

21

relevant facts to the police or a prosecutor can go to malice and causation, it has no bearing on probable cause. *Richey*, 952 S.W.2d at 519.

Unless the facts underlying the initiation of a prosecution are undisputed, in which case probable cause is a question of law, the issue is for a jury to decide. *Id.* at 518 ("When the facts underlying the defendant's decision to prosecute are disputed, the trier of fact must weigh evidence and resolve conflicts to determine if probable cause exists, as a mixed question of law and fact.").

**B. Analysis**

**1. Evidence overcoming the presumption of probable cause**

*Suberu* provides one example of the presumption never disappearing. Suberu lost her case against Kroger because the presumption stood: she had no evidence that Kroger had a motive to accuse her of shoplifting (such as prior bad relations, outstanding debt, or the like), nor did she have other information such as Kroger's withholding exculpatory evidence or Kroger employees' collaborating to gin up a story before going to the manager with their accusation. *Suberu*, 216 S.W.3d at 795.

In a contrasting case with the opposite result, homeowners who had their builder criminally charged with misappropriating construction-loan proceeds were found to have lacked probable cause based on other information that the jury could have credited. *San Antonio Credit Union v. O'Connor*, 115 S.W.3d 82, 88–90, 94–95 (Tex. App.—San Antonio 2003, pet. denied) (op. on reh'g) (noting that jury could have found that homeowners acted unreasonably based on evidence that they knew that

22

money was "tied up in 'retainage,' that the lumber bill was unpaid, not because [builder] stole the money, but because of a theft from the construction site, and that the costs associated with the [homeowner-requested] 'extras' were consuming money that should have been used to pay for the originally agreed upon bid"); *see also Tranum v. Broadway*, 283 S.W.3d 403, 415–16 (Tex. App.—Waco 2008, pets. denied) (holding that presumption was rebutted by evidence that defendant "possessed a private motive to harm" plaintiff); *Thrift v. Hubbard*, 974 S.W.2d 70, 78–80 (Tex. App.—San Antonio 1998, pet. denied) (where disgruntled investor initiated criminal complaint accusing plaintiffs of misapplication of funds and theft, affirming that probable cause did not exist because jury could reasonably have found that investor knew age of accounts receivable he claimed to have been deceived about; that he deposited a loan-repayment check knowing it would bounce; that his criminal complaint misrepresented the source of those repayment funds; and that he knew that plaintiffs had legitimate business purposes for using receivables he claimed they stole).

*Thrift* also illustrates the appropriately modest role for an appellate court reviewing probable cause: even though the reviewing court found "compelling" the investor's testimony that he had a good-faith belief that his investment was stolen, it recognized that the evidence also fairly supported a finding that he was a "disappointed investor who gambled and lost on a fledgling company." 974 S.W.2d at 79–80 ("It is reasonable to interpret the evidence in this case as proving that Thrift filed his criminal complaint against the Hubbards, knowing it was specious, in an

attempt to avenge his lost investment or to gain an advantage in the civil litigation stemming from these same facts.").

Here, evidence abounded not only that Bearden possessed a private motive to harm Leclair but also that she possessed other information from which the jury could find that when she went to the DA and the grand jury, she did not honestly and reasonably believe that Leclair had stolen $18,500 from her:

- Bearden was publicly upset with Leclair over the NRBC and was hurt (if not made irate) by his suggestion that she might need to seek another trainer;

- Shortly after, she reached out to Dugan and agreed to be his secret "trump card" in his efforts to extract favorable terms from Leclair in their partnership dispute;

- Bearden did not start demanding papers from Leclair until that point, although she had had possession and had been paying Surge's bills for months;

- Because Surge was too young to show, Bearden was unconcerned about not getting papers until later, after L&D issues were resolved;

- Bearden knew all along that Dugan owned the horse;

- Bearden enthusiastically embraced a plan to threaten criminal prosecution as leverage for Dugan;

- Contrary to what she told the grand jury, Dugan did not want Surge back, and she did not tell the grand jury that Leclair had offered to return her money;

- Bearden knew that Leclair and Dugan were involved in a partnership dispute where each claimed that the other owed him money, and she didn't know whom to believe;

- Bearden knew of AQHA's process to obtain papers when a seller is uncooperative but never initiated that process; and

- Bearden told Johnson about her deal with Dugan that she could have Surge but that Dugan was going to hold the papers until his dispute with Leclair was over.

The jury heard plenty of evidence—which it found credible—that made the probable-cause presumption vanish.

### 2. Bearden did not conclusively establish her probable cause.

Bearden next argues that even if Leclair produced evidence that rebutted the presumption, she conclusively proved her probable cause as a matter of law. Again, we disagree.

Bearden posits two crimes that she reasonably believed Leclair committed: "theft by taking the purchase money she paid for Electric Surge and failing to provide her with the horse's registration papers" and "theft, based on the fact that Leclair sold her Electric Surge without Dugan's permission."

Both sides agree that probable cause is measured against "the crime for which [the plaintiff] was prosecuted." *Richey*, 952 S.W.2d at 517. As opposed to Bearden's appellate framing of Leclair's alleged acts of theft, the grand jury indicted Leclair for stealing Bearden's money, with the implication that she got nothing in return.[19] She told the grand jury that:

- she purchased the horse from Leclair on January 2, 2012 for $18,500;

---

[19]Based on trial testimony that, without papers, Surge was worth only $300 to $500, Bearden tells us that she believed she "received *practically* nothing in return." [Emphasis added.] But she said nothing to the grand jury about any diminished value.

- she learned in April or "around the first part of May" that the horse was not Leclair's to sell;

- she had a conversation with the "actual owner-of-record," who told her that he had never given Leclair authority to sell the horse;

- Leclair knew that Dugan owned the horse;

- she had a text message revealing that "Leclair knew that Dugan had never given him permission to sell the horse";

- Leclair sold Bearden a horse that didn't belong to him, and he received money for it;

- she was paying the bills on the horse, but Dugan still owned the horse "as far as the title goes"; and

- Dugan wanted his horse back.

Setting aside the disingenuousness of many of these statements—and Johnson's testimony that what Bearden swore to the grand jury was "inconsistent" with what she had told him—Bearden knew much more that she did *not* tell the grand jury: Bearden was Dugan's "trump card" in his campaign to get the most out of L&D and Leclair; Leclair had reminded Bearden that Dugan knew that Surge "was being sold to go towards his bill I told you that"; Dugan was going to hold Surge's papers until he and Leclair settled up, at which point Bearden would get them; and Bearden knew that she could always go through the AQHA to get the papers even if Dugan or Leclair never cooperated.

In short, Bearden knew that she paid $18,500 for a horse and that her ownership was never in doubt. That alone shows lack of probable cause to accuse

Leclair of felony theft of money, although there's something even more fundamental: Bearden did not tell the grand jury that Leclair had offered her money back, an offer that would surely torpedo any honest and reasonable person's belief that a theft had been committed.

As for Leclair's alleged crime of selling a horse without Dugan's permission—which strikes us as something *Dugan* would prosecute—the jury had ample evidence that Bearden did not honestly and reasonably believe that either. Even if Leclair had flouted Dugan's request to hold up on completing and depositing the funds from Surge's sale until they agreed on other partnership matters, Bearden knew that Dugan never asked her for the horse back and knew that from every indication he was perfectly happy that she had been paying insurance and expenses since January. A jury could reasonably believe that Dugan's real beef with Leclair was whether Dugan should have gotten the $18,500 so that he could pay off the credit card he'd used to buy Surge versus Leclair's giving Dugan an invoice credit, which didn't help the cash-strapped Dugan. And a rational jury could have found that the "authorization" issue surfaced as a convenient pressure point only after Bearden became agitated with Leclair in April and only after both Dugan and Bearden—for different reasons—seized upon a joint opportunity to get at Leclair.

Rather than acknowledging the evidence that was properly before the jury, which in a no-evidence review we are bound to credit, *see, e.g.*, *Gunn*, 554 S.W.3d at 658, Bearden points to Leclair's ostensible trial admission of his theft as conclusive

27

proof of her probable cause, relying on *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466 (Tex. 2004). There, a secured lender had complained to the authorities—"which it had every right to do"—that it could not locate either its debtor or most of the collateral cattle, although the information the lender provided was inaccurate and incomplete in certain respects. *Id.* at 468–70. The district attorney indicted Martin for a different crime: selling *other* cattle and keeping the proceeds, *id.* at 469; "nothing the Bank reported or failed to report caused the indictment relating to Martin's cattle sale," *id.* at 472. Martin was arrested, but the charges were ultimately dropped. *Id.* Reversing judgment for Martin on his malicious-prosecution claim, the supreme court noted that, at trial, Martin had admitted all the objective elements of the crime for which he was indicted and thus could not establish lack of probable cause. *Id.* at 470. Any errors on the lender's part were therefore immaterial. *Id.*[20]

Bearden urges that Leclair himself, like Martin, conclusively established her probable cause by admitting at trial all the elements of theft: acquiring or exercising control over property ("appropriating" property) without the owner's effective consent ("unlawfully") and with the intent to deprive the owner of the property. *See* Tex. Penal Code Ann. § 31.03(a), (b)(1). She points to Leclair's acknowledging that he

---

[20]The supreme court also observed that "[n]o credit system in the world can last long if creditors are punished for lawfully demanding their money back," *First Valley Bank of Los Fresnos*, 144 S.W.3d at 468, as if to suggest that secured lenders have some sort of automatic "super presumption" of probable cause. The situation at hand is much different.

deposited her checks into his bank account (thus "appropriating" her money), that he spent the money to pay personal debts, that Dugan had told him the day before he deposited the checks to hold up on completing the sale and depositing monies, and that Leclair ignored Dugan, depositing and spending the money anyway. Bearden also refers us to Leclair's affirmative answer to an "if–then" question: "[I]f Dr. Dugan told Ms. Bearden that you did not have authority to sell Electric Surge, then she had every right in the world to file a criminal charge against you; isn't that true?"[21]

But Bearden's position presents a cramped reading of *Martin* that fails to take into account the facts on the ground here. Based on the evidence before it, a reasonable jury could have believed that Bearden and Leclair had entered a verbal contract in December 2011. Bearden had given Leclair two post-dated checks in December, to allow her time to move funds around before January 2 and January 4, the dates of the checks. She applied for insurance to be effective January 1, 2012 and represented that as the sale date, with Dugan as the seller. She started paying Surge's expenses to LPH in January 2012, and Dugan stopped. She wasn't concerned about

----

[21]This question came during a lengthy cross-examination about Leclair's deposition testimony from over four years earlier. His September 2014 deposition took place before Bearden's grand-jury testimony was ordered disclosed and before Leclair learned that she had complained about a theft of money, not papers. Leclair also did not know, when he was deposed, that Bearden was the only grand-jury witness and was the only one calling him "a liar and a thief" on social media; nor did he know the particulars of the "trump deal" between Bearden and Dugan, all of which later-revealed information was reiterated on redirect to put matters in context. We do not consider his "admission" to be quite the "gotcha" statement that Bearden proposes.

the papers because Surge wasn't old enough to show. She and Dugan saw each other often at Leclair's facility, and nothing hinted that Dugan didn't consider the horse to now be Bearden's. Dugan said nothing to Bearden for four months about having retracted his authorization—assuming that was even possible on January 3 when he asked Leclair, who considered the deal completed in December, to hold up on it.[22] Everyone acted as if the sale was complete by January 1, 2012, and it's undisputed that Dugan never asked for the horse back.

Bearden had four months' knowledge of all these facts before she and Dugan began collaborating and before Dugan told her that Leclair allegedly wasn't authorized to sell Surge. It's true that a complainant does not have a duty to make inquiry if a crime seems reasonably to have been committed, *see Suberu*, 216 S.W.3d at 794, but by the same token, a complainant cannot ignore her own "lived experience" of events. By urging us to examine only the bark and maybe a few leaves on one tree in a vast forest, Bearden would have us ignore the many other trees swaying all around vying for evidentiary attention. Bearden did not conclusively prove her probable cause as a matter of law.

---

[22]As Leclair put it at oral argument, Dugan's text didn't create a "time machine" to revoke authority for a sale that had already occurred; just because Dugan wanted to negotiate L&D's dissolution differently after Topper died did not make Leclair's actions retroactively criminal.

### 3. Factual sufficiency on lack of probable cause

Bearden's first issue is framed as involving "no evidence and/or factually insufficient evidence," but her briefing centered on legal sufficiency. Although Bearden concluded her discussion with one sentence that "[a]lternatively" mentioned factual insufficiency, she did not brief it. Because her treatment was "cursory," we will similarly "follow [Bearden's] lead in the depth of detail we give to it." *Durant v. Anderson*, No. 02-14-00283-CV, 2020 WL 1295058, at *10 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op. on remand). *But see Gillespie v. Nat'l Collegiate Student Loan Tr. 2005-3*, No. 02-16-00124-CV, 2017 WL 2806780, at *2 (Tex. App.— Fort Worth June 29, 2017, no pet.) (mem. op.) (declining altogether to address factual-sufficiency claim raised only "in passing").

Bearden did offer evidence that competed against Leclair's; she testified that she had believed Dugan when he told her that he had not authorized Leclair to sell Surge and that Leclair had not paid over the proceeds to Dugan, meaning that Dugan was holding the papers—which she said were ultimately Leclair's responsibility to obtain—until Leclair paid him. Leclair's countervailing evidence, which we have detailed at length, was factually sufficient to support the jury's finding that Bearden lacked probable cause. We consider all the evidence in a factual-sufficiency review but give weight to the jury's determination of witness credibility. *Durant*, 2020 WL 1295058, at *11 (citing cases). The evidence that Leclair introduced was "not so weak that it was not worthy of belief." *Id.* Viewing the record as a whole, the

31

evidence supporting the jury's no-probable-cause finding was not so against the great weight of the evidence that upholding it would be manifestly unjust. *See Cain*, 709 S.W.2d at 176.

We overrule Bearden's first issue.

## VII. Defamation

The jury found that Bearden published defamatory statements accusing Leclair of engaging in theft, misappropriating client property, and being dishonest in his business dealings. It also found that Bearden knew or should have known, in the exercise of ordinary care, that the statements it found defamatory were false and had the potential to be defamatory. *See D Mag. Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 434 (Tex. 2017) (laying out defamation elements). In the damages question, the jury was instructed that statements that Leclair "was dishonest in his business practices or engaged in criminal conduct are defamatory per se."

Bearden challenges the "knew or should have known" factor of a defamation claim, arguing that she conclusively proved that she took reasonable steps to verify the accuracy of her statements before publishing them and thus was not negligent. In her reply brief, she adds that her statement that Leclair "was absolutely told NOT to sell by the owner and his business partner" was not a false statement "as a matter of law."[23]

---

[23]Bearden raised this argument for the first time in her reply brief, in response to Leclair's briefing that she not only should have known but *did* know that her

This was the Facebook question Bearden arranged for on May 24, 2012:



**Paula Parkhill**

I have a strange question and I am looking for some help or advice from anyone that might have been thru something like it. Has anyone had a trainer steal from you or sell your horse and then not pay you for it? Or cheated you out of training or work but you paid for it? Thanks for any help or advice.

Like · Comment · Follow Post · Yesterday at 2:19pm

After a number of people responded, Bearden weighed in:

---

statements were false. Bearden's opening brief headed her Issue Two discussion thusly: "There is no evidence and/or factually insufficient evidence that Bearden knew or should have known that her allegedly defamatory statements were false." Although the question is a close one whether we should consider her late-briefed argument, in the interest of thoroughness we will do so. *Cf. Prescription Health Network, LLC v. Adams*, 02-15-00279-CV, 2017 WL 1416875, at *7 (Tex. App.—Fort Worth Apr. 20, 2017, pet. denied) (mem. op.) (declining to interpret issue complaining that arbitrator "exceeded its authority" as fairly including reply argument that arbitrator did not issue a "reasoned award").





**A. Falsity versus substantial truth (reply-brief argument)**

Bearden's reply brief argues that the "absolutely told NOT to sell" part of her post was true, or at least substantially so. *See KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 714 (Tex. 2016) (holding that a statement need not be "perfectly true; as long as it is substantially true, it is not false"). But beyond our disagreement with that proposition based on all the facts we have already discussed, and beyond the fact

34

that her post(s) said more than that one thing, it was Bearden's burden to raise and prove substantial truth as an affirmative defense.

Although public figures and private plaintiffs suing media defendants on matters of public concern must prove falsity,[24] *see Brady v. Klentzman*, 515 S.W.3d 878, 883 (Tex. 2017); *Bentley v. Bunton*, 94 S.W.3d 561, 586 (Tex. 2002), at common law a presumption of falsity exists, making it a defendant's burden to prove otherwise. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995) ("In suits brought by private individuals, truth is an affirmative defense to slander." (footnote omitted)); *Van Der Linden v. Khan*, 535 S.W.3d 179, 198–99, 199 n.10 (Tex. App—Fort Worth 2017, pet. denied) (recognizing truth as affirmative defense in defamation actions involving private individuals where no constitutional issues are implicated); *see also Knox v. Taylor*, 992 S.W.2d 40, 53–54 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (rejecting defendant–appellant's argument that jury's negative answer to question on substantial truth was against great weight and preponderance of evidence).

Jury Question 11 embedded the falsity presumption, asking whether Bearden knew or should have known that her statements "*were false*," the only predicates being questions on publication and defamatory meaning. Bearden did not propose a preliminary question and instruction asking the jury to assess falsity—a necessary finding if it was Leclair's burden—nor did she object to its absence. *See* Comm. on

---

[24]From our review of the record, Bearden did not contend that Leclair was a public figure.

35

Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: Business, Consumer, Insurance & Employment* PJC 110.4 & cmt. (2018) (recommending pattern question on falsity that "should be used when the plaintiff is required to establish that the publication is false"). Nor did Bearden ask for a question on substantial truth, an affirmative defense she would have had to prove. *See id.* PJC 110.8 & cmt. (setting out question on substantial truth to "be submitted only in cases when the common-law presumption of falsity applies; in such cases substantial truth is an affirmative defense"). If, as Bearden asserted in her reply brief, she "has always maintained the post was not false," we would expect to find pleadings, requested instructions and questions, or charge objections so maintaining, but we have not.[25]

When it comes to substantial truth, then, at this point we think the horse is out of the barn, and we reject Bearden's argument on this defensive matter.

## B. Knew or should have known

Bearden argues that the evidence conclusively proved that she lacked the requisite state of mind for defamation liability because she published only "what [she] knew at the time to be true" and because she took reasonable steps to verify the truth before publishing her Facebook comments. As with her narrow discussion of the probable-cause evidence, a step back shows that these arguments, particularly when

---

[25]Even Bearden's opening brief referred to "the undisputed facts, *as Bearden understood them*, were that Leclair had indeed sold her Electric Surge without Dugan's permission." [Emphasis added.]

considering the timing and content of her Facebook comments as a whole, lack conclusive supporting evidence.

The applicable level of fault in this case is negligence. *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015) (orig. proceeding) (noting that although a public figure or official must prove actual malice, "[a] private individual need only prove negligence"); *Bedford v. Spassoff*, 485 S.W.3d 641, 648 (Tex. App.—Fort Worth 2016), *rev'd in part on other grounds*, 520 S.W.3d 901 (Tex. 2017). A plaintiff such as Leclair must prove that (1) the defendant knew or should have known that the statement was false and (2) the publication's content would warn a reasonably prudent person of its defamatory potential. *See Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819–20 (Tex. 1976). Negligence in this context also asks whether the defendant acted reasonably in checking the truth of the communication before publishing it. *Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi–Edinburg 2003, pet. denied); *see also Newspaper Holdings, Inc. v. Crazy Hotel Assisted Living, Ltd.*, 416 S.W.3d 71, 85–86 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (holding no evidence of negligence where reporter cited multiple consistent sources and plaintiff did not return messages asking for comment).

Based on the same facts we laid out above in Section VI.B. in analyzing probable cause, the jury could have reasonably found that the one–two punch of Bearden's Facebook post was defamatory because she *knew* it was false, as opposed to her not taking reasonable steps to confirm its accuracy ("should have known"). But

37

even if we follow Bearden's lead and focus on her assertion that "the evidence conclusively establishes that Bearden took reasonable steps to verify [her post] before she published it on Facebook," we are not persuaded.

Bearden maintains that "[b]ecause Dugan (among others) told [her] that Leclair did not have permission to sell Electric Surge, and further because Leclair, when confronted, did not deny it, Bearden exercised reasonable care before publishing the May 24, 2012 Facebook post as a matter of law." The confrontation to which Bearden refers is the May 8 text exchange we quoted in Section II.F. and reproduce below. It started with her demand for papers by that Wednesday:

```
Sent on 5/8/2012 2:01:00 PM to Jared LeClair

You can email bill of sale cambearden@sbcglobal.net. I need
it no later than 10:00 am I also need papers no later than
Wed. I do not want to pursue legal action against you as it
will be very ugly. Rest assured I will do whatever it takes
to get my property
```

```
Received on 5/8/2012 2:07:04 PM from Jared LeClair

I know you will and don't blame you I know you guys talk to
Danny he won't text me back and I know that's not your
problem I would like to talk to you sometime to tell you
some things if you don't want to I understand
```

```
Sent on 5/8/2012 2:14:14 PM to Jared LeClair

The bottom line is you sold me a horse that you were told
not to sell and you did it anyway and pocketed the money-
nothing to say to you except you have lost every bit of
trust and respect I ever had for you
```

Contrary to Bearden's contention that in response to that last text Leclair did not deny selling Surge without permission, the entirety of his same-day reply, below, corroborates that (1) the sale took place on January 1 and (2) he and Dugan had

38

agreed to apply the proceeds to Dugan's LPH bill, something that carries with it at the

very least an implicit denial of an unauthorized sale:

```
Received on 5/8/2012 2:37:15 PM from Jared LeClair

I told Danny I was selling him to you jan first because of
tax reasons the deal was done then he told me he didn't want
to sell anything I told he after my divorce I would give him
the money back why would I sell you a horse i that wasn't
for sale to at the time was my best customer that doesn't
make sense Danny and I had a agreement it doesn't look like
that is going to happen and I will have to give you your
money back and the money you paid in expenses I have never
lied to you and won't ever lie to you that's what happened
he knew the horse was being sold to go towards his bill I
told you that
```

When we consider the evidence of Bearden's not demanding papers until May,

her secret deal to work with Dugan, and the pleasure she took not only in

contemplating but in attempting to orchestrate Leclair's downfall, her argument that

Leclair's alleged nondenial meant that she had satisfied her duty of reasonable care as

a matter of law is unconvincing. The jury heard testimony about the context of

Bearden's demands and could reasonably have concluded that she was not acting in

good faith but was instead trying to force Leclair into a better deal for Dugan or to set

him up for the criminal charges that soon followed. Regardless, her texts with Leclair

did not conclusively establish her reasonable care as a matter of law.[26]

We overrule Bearden's second issue.

---

[26]As with probable cause, Bearden's argument on defamation ends with a throw-away line about factual insufficiency, which we reject for the same reasons mentioned in Section VI.B.3. The jury's finding was not against the overwhelming weight of the evidence.

# VIII. Damages

Bearden's third issue attacks the reputation and mental-anguish damages on legal-sufficiency grounds or—if need be—as excessive and warranting a suggestion of remittitur; her fourth and final issue concerning exemplary damages comes into play only if her third issue succeeds. Although Bearden again mentions factual sufficiency in passing, she does not analyze it and focuses entirely on legal sufficiency. "These extraordinary damage awards must be reversed in their entirety because there is no evidence that Leclair suffered anything close to compensable injury under any damage measure. . . . At most, the evidence supporting the awards is factually insufficient." Bearden's discussion went on to evaluate only legal sufficiency for both types of damages. We will do likewise, looking only to see if more than a scintilla of evidence supports the jury's assessment that Leclair is entitled to compensation. *See, e.g., Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 713 (Tex. 2016) (applying usual no-evidence test to damages challenge). More than a scintilla exists. Nonetheless, we would find the evidence factually sufficient if called upon to weigh it under that standard.

We keep in mind that noneconomic damages compensate for noneconomic harm and "are not amenable to calculation with 'precise mathematical precision.'" *Anderson*, 550 S.W.3d at 618 (quoting *Brady*, 515 S.W.3d at 887).

40

## A. Legally sufficient evidence

### 1. Reputational harm

Reputation damages are available for claims of malicious prosecution and defamation, *see id.* at 621, and the legal standards for recovering reputation damages for both claims are the same, *see* Restatement (Second) of Torts § 670 cmt. A (1977). Generally speaking, two types of evidence can support an award of reputation damages: direct evidence that "people within the community 'thought less of' the plaintiff," and "evidence of a lost job or business opportunity." *Mem'l Hermann Health Sys. v. Gomez*, No. 19-0872, 2022 WL 1194374, at *9 (Tex. Apr. 22, 2022) (citing *Brady*, 515 S.W.3d at 887, and *Anderson*, 550 S.W.3d at 622–23, respectively).

More than a scintilla of evidence exists that Leclair's reputation suffered as a result of his wrongful indictment and Bearden's defamation. Johnson testified that Leclair had a good professional reputation that was on the rise immediately before the events in question and that Johnson, a competitor in the training business, would even seek Leclair's help with his own clients. But after the indictment, Johnson was reluctant to suggest that any of his clients buy a horse from Leclair, saying that "it's hard . . . for you to tell a client it's a good idea, let's go down there and buy a horse, and . . . possibly be [in] the same situation."[27] Johnson observed that Leclair had fewer

---

[27]Trainers often also broker buying and selling horses. An accusation of horse theft would be self-evidently damaging to a trainer's reputation, and Leclair testified directly that being accused of horse thievery would "be detrimental to a horse trainer."

horses to show at competitions after the indictment, something that Mike Seay also witnessed.[28] Johnson "felt you needed to distance yourself from -- from [Leclair] with everything that was going on. It was not -- it was not good in the public eye."

Leclair noticed a difference in how people reacted to him at horse shows, as well as experiencing a sharp drop-off in the summer of 2012 in the number of horses clients were sending him for training, down from around 30 to roughly 15. Although Leclair went on to win an impressive amount of prize money that offset his decreased boarding and training revenues, after the indictment his gross income experienced a "significant drop" on the order of around $300,000 in 2012, and it took him "a couple of years" to build it back up. Leclair testified that "the indictment was the reason" for that decrease. As *Anderson* instructs, reputation damages can be shown by a lost job or business opportunity. 550 S.W.3d at 622. Leclair also connected the fact of people staying away from him at horse shows to finding out that Bearden was posting things on social media.

Although Bearden contends that Leclair needed to present a witness who had read the Facebook post or who didn't do or stopped doing business with him because of the indictment, Texas law does not require such specific proof for proving general

---

[28]Bearden argues that Seay's testimony about Leclair's having fewer customers to haul during this period proved only that Leclair was having staffing issues. But when asked why Leclair was hauling only one nonprofessional client and was needing Seay for help at one particular show, Seay attributed it to both scenarios: "He didn't have the customers to haul and he didn't have the help."

noneconomic harm. For example, *Brady* was a defamation action brought by the son of a chief sheriff's deputy against a reporter and newspaper for an article portraying Brady as unruly and intoxicated when pulled over and suggesting that he was a criminal who used his father's connections to skirt the charges against him. 515 S.W.3d at 881–82. Affirming the court of appeals' remand for a new trial, the supreme court disagreed with the media defendants' argument for rendition on grounds that there had been legally insufficient evidence at trial of reputational harm. *Id.* at 886–88. The supreme court noted that "there must be evidence that people believed the statements and the plaintiff's reputation was actually affected." *Id.* at 887 (citing *Burbage v. Burbage*, 447 S.W.3d 249, 261–62 (Tex. 2014)). And Brady presented such evidence:

> One witness described the plaintiff as having a reputation for being a "good kid" before the article was published. The plaintiff's father testified that after the article, he met "people in the community that had a negative impression" of him. That some people thought less of the plaintiff after the article was published was direct proof of injury to the plaintiff's reputation.

*Anderson*, 550 S.W.3d at 621–22 (summarizing the evidence in *Brady*) (cleaned up).

In *Anderson*, the supreme court held that the plaintiff presented more than a scintilla of evidence that kickback allegations damaged his reputation where a prospective employer, Hiley, testified that Anderson had had a "really good reputation," but after hearing the allegations, Hiley would not consider hiring him for any position unless Anderson cleared his name. *Id.* at 622–23. That evidence was "not

43

merely hypothetical or speculative, but directly reflect[ed] Hiley's opinion about Anderson's character." *Id.* at 623. "Conclusive proof" of a lost opportunity is not required, "but rather a reasonable inference that Anderson's reputation changed for the worse. This evidence is enough to cross the legal-sufficiency threshold regarding the existence of reputation damages." *Id.* Here, Johnson's testimony was comparable in his expressed reluctance to send business Leclair's way in the wake of the indictment.

We hold that there is some evidence, as in *Brady* and *Anderson*, that Leclair suffered reputational harm.

### 2. Mental anguish

Bearden next argues that the evidence is legally insufficient to support any mental-anguish damages. To support such an award, the evidence must show both the existence of compensable mental anguish and justification for the amount awarded. *Emerson Elec. Co. v. Johnson*, 601 S.W.3d 813, 840 (Tex. App.—Fort Worth 2018) (citing *Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013)), *aff'd on other grounds*, 627 S.W.3d 197 (Tex. 2021). The record must provide either direct evidence of the nature, duration, and severity of a plaintiff's mental anguish, thus establishing a substantial disruption in his daily routine, or evidence of a high degree of mental pain and distress that exceeds mere worry, anxiety, vexation, embarrassment, or anger. *Anderson*, 550 S.W.3d at 618–19 (citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)).

Although corroborating evidence of mental anguish, including from a spouse or friend, can be helpful in determining evidentiary sufficiency, a plaintiff's testimony alone can suffice. *See id.* at 619–20 (contrasting *Bentley*, 94 S.W.3d at 576 (corroborating testimony from wife and a friend), with *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 233 (Tex. 2011) (testimony only from plaintiff)); *see also Gordon v. Redelsperger*, No. 02-17-00461-CV, 2019 WL 619186, at *2 (Tex. App.—Fort Worth Feb. 14, 2019, no pet.) (mem. op.) (affirming award for past physical pain and mental anguish where only testimony was from plaintiff and wife about "the impact and consequences of the assault").

Here, the jury heard evidence of mental anguish from Leclair himself and from Seay, a pastor who ministered at and himself participated in horse shows and interacted with Leclair both before and after his arrest, thus enabling him to observe Leclair's differing states of mind.

Leclair testified that in the weeks after his indictment and arrest, he experienced dry heaving, diarrhea, "involuntary muscle twitches" that scared him "to death," sleeplessness, and anxiety so intense that he sought medical help.[29] While the criminal case was still pending, Leclair's younger brother died, and Leclair felt unable to talk with his grieving parents about what had happened to him, keeping it to himself and feeling "numb." Leclair saw a counselor for over a year, became close with Seay,

---

[29]A doctor prescribed medication, which Leclair took only once because its side effects reduced the reaction time he needed.

described himself as an emotional "wreck," and even contemplated suicide—a thought he pushed aside because he knew it would further devastate his parents.[30] Leclair felt isolated and reclusive: "you can always tell when you go to a horse show and you're around everybody, and when you're walking by and you kind of see someone look at you, and then you can tell when they're talking about you." Although Leclair was going through a divorce and experiencing other stressors during this period, he characterized his indictment and arrest as "significantly more traumatic" to his emotions, substantially disrupting his daily routine and causing him a high degree of mental pain and stress that he had never before experienced. We view this testimony as substantively similar to the *Anderson* plaintiff's (uncorroborated) testimony, which was held legally sufficient. *Anderson*, 550 S.W.3d at 620 (discussing plaintiff's testimony about changed demeanor, trouble sleeping, and treatment for anxiety and depression after being accused of taking kickbacks).

As for Seay, before the arrest he had heard of Leclair's impending divorce and reached out, as a casual acquaintance, to offer his help (which Leclair did not take him up on) and became better acquainted with Leclair in the weeks leading up to the arrest. An "extremely emotional" Leclair called Seay right after he bonded out of jail. Leclair's "voice was cracking and breaking," and during their almost-hour-long conversation, he talked to Seay about his "nightmare" experience. Seay followed up

___

[30]When deposed, Leclair did not mention suicidal ideation as a manifestation of his mental anguish.

by calling Leclair the next day and thereafter would counsel him about "his fear[], his depression" several times a week. After Leclair brought up the thought of suicide, Seay began calling daily to check on his welfare, and if Leclair was unreachable, Seay would call two other people at Leclair's barn and ask how Leclair was doing. During this time, Leclair expressed to Seay that he felt "no hope"—"his business was gone. He felt that his reputation was ruined."

This testimony is some evidence of compensable mental anguish resulting from malicious prosecution and is certainly not "so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered." *Durant*, 2020 WL 1295058, at *8.

**B. Amount of damages**

For past reputational harm, the jury awarded Leclair $150,000 for the malicious prosecution and $50,000 for Bearden's defamation. For malicious prosecution, the jury also awarded $500,000 for Leclair's past mental anguish, reduced to $485,000 in the judgment. Bearden assails these amounts as "exorbitantly excessive."

We review an excessiveness challenge for factual sufficiency, something that is committed to our exclusive jurisdiction, *Anderson*, 550 S.W.3d at 620, and that is "highly deferential to the jury's findings," *Gordon*, 2019 WL 619186, at *4. With "few specific guideposts to follow," our task is "even less certain when reviewing the factual sufficiency of nonpecuniary damages," *id.*, and the "discretionary nature of [noneconomic-damage] awards . . . dulls the allure of remittitur," *Durant*,

47

2020 WL 1295058, at *34. Still, certain parameters are instructive, including awards in similar cases. *Anderson*, 550 S.W.3d at 620–21, 623.

In keeping with the briefing's structure, we discuss mental anguish first.

### 1. Mental anguish

Juries must necessarily have a measure of discretion in assessing damages given "the impossibility of any exact evaluation of mental anguish," although they "cannot simply pick a number and put it in the blank." *Bennett v. Grant*, 525 S.W.3d 642, 648 (Tex. 2017) (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)). Rather, the touchstone is an amount that "would fairly and reasonably compensate" for the distress, and evidence must exist that the amount found is indeed fair and reasonable. *Saenz*, 925 S.W.2d at 614 (holding no evidence that plaintiff suffered mental anguish or that amount awarded would be fair and reasonable where only evidence was plaintiff's testimony that she "worried . . . a lot" about who would pay for her anticipated lifetime medical expenses and whether she and her husband could keep their home).

Mental-anguish awards in wildly differing amounts have been upheld depending on the underlying claim. In *Anderson*, involving a defamatory whisper campaign about kickbacks but no criminal prosecution, the supreme court "pointed to cases upholding past mental-anguish awards of $20,000, $25,000, $35,000, and $50,000, stating that these cases involved similar or more egregious defamatory behavior." *Durant*, 2020 WL 1295058, at *33 (citing *Anderson*, 550 S.W.3d at 619,

48

620 n.65). Then again, mental-anguish awards in amounts ranging from $100,000 to $250,000 have been upheld in other defamation cases. *See, e.g.*, *Memon v. Shaikh*, 401 S.W.3d 407, 419–20 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ($100,000), *judgment withdrawn*, *appeal dismissed*, No. 14-12-00015-CV, 2014 WL 6679562 (Tex. App.—Houston [14th Dist.] Nov. 25, 2014, no pet.) (per curiam) (mem. op.); *Tranum*, 283 S.W.3d at 422 ($250,000); *Bunton v. Bentley*, 176 S.W.3d 18, 20–21 (Tex. App.—Tyler 2003) ($150,000), *rev'd on other grounds*, *Bunton v. Bentley*, 153 S.W.3d 50 (Tex. 2004). For cases involving mental anguish over a sexual assault or a child's abduction, awards of $1.5 million and $2 million, respectively, have been upheld. *Sheikh v. Doe*, No. 05-19-01329-CV, 2021 WL 2947663, at *4–5 (Tex. App.—Dallas June 30, 2021, no pet.) (mem. op.) (sexual assault); *Guimaraes v. Brann*, 562 S.W.3d 521, 546–47 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (child abduction).

Bearden points us to several malicious-prosecution cases involving mental-anguish damages, chief among them *Bennett*, 525 S.W.3d at 647–49, in which the plaintiff received $5,000 for his mental anguish. Calling the award "relatively modest," *id.* at 648, the supreme court was examining not the reasonableness of the *amount*, but rather whether legally sufficient evidence existed to support a mental-anguish award in the first place. As Leclair notes, nothing in *Bennett* tells us whether some vastly higher amount would have survived scrutiny.

On the other hand, excessiveness was an issue in *Eans v. Grocer Supply Co.*, 580 S.W.2d 17 (Tex. App.—Houston [1st Dist.] 1979, no writ). There, but for a

49

JNOV, a plaintiff wrongly accused of misdemeanor theft would have won $100,000 in damages upon a jury instruction that "it might take into account in connection with the damage issues the elements of mental anguish, embarrassment and humiliation and any necessary bond fees and attorney's fees in defense of the criminal prosecution." *Id.* at 23. There was evidence that Eans had incurred $1,550 in legal and bond fees, so the remaining $98,450 represented noneconomic harm. After holding that the trial court erred in entering a JNOV in the defendant's favor, the appellate court agreed with the defendant's conditional cross-point on excessiveness and suggested a remitter of $30,000 off the $100,000 in exercising its "sound judicial judgment and discretion in the ascertainment of the amount that would be reasonable compensation for the injury sustained." *Id.* The court did not explain its reasoning, although it noted Eans's testimony that he "felt bad" whenever he had to make a court appearance. *Id.* Eans's sister testified that she had observed changes in him since the arrest, which the court summarized: "He is withdrawn, goes through strains of depression and is restless. He could not sleep when he had to go to court. He did not socialize like he used to, and he expressed present feelings of anxiety about being branded a criminal." *Id.*

Other courts have compared pecuniary to nonpecuniary mental-anguish awards, considering a highly lopsided ratio to be some indication—though not so in and of itself—that factually insufficient evidence supports the latter. *See Lane v. Martinez,* 494 S.W.3d 339, 342, 347, 351 (Tex. App.—Eastland 2015, no pet.) (noting

17:1 ratio of nonpecuniary to pecuniary damages, along with outsized award compared with similar cases and the jury's having apparently chosen an overall damage award that it then split equally among eight damages categories, including mental anguish, as collectively showing factual insufficiency); *Bishop Abbey Homes, Ltd. v. Hale*, No. 05-14-01137-CV, 2015 WL 9167799, at *18–19 (Tex. App.—Dallas Dec. 16, 2015, pet. denied) (mem. op.) (noting ratio of roughly 6:1 between mental-anguish award and pecuniary loss arising from foundation issues and suggesting remittitur to amount in plaintiffs' pretrial disclosures, which sought mental-anguish damages equal to repair costs), *supplemented*, No. 05-14-01137-CV, 2016 WL 80546 (Tex. App.— Dallas Jan. 7, 2016, no pet.) (mem. op.). And of course, nonpecuniary awards are possible when there are *no* economic damages. *E.g.*, *Bentley*, 94 S.W.3d at 575–76.

Here, we do not consider $485,000 to be excessive for Leclair's mental anguish connected with the malicious prosecution. He testified to experiencing a high degree of anguish over being indicted and arrested, and Seay corroborated that anguish. Although other events in Leclair's life—the divorce, Topper's accident, his business breakup with Dugan, financial difficulties, and his brother's death—contributed to his emotional state, Leclair characterized his indictment and arrest as "significantly more traumatic." He testified to a degree of mental pain and stress that he had never before experienced, and attributed that pain and stress to the felony-theft accusation and its aftermath.

Leclair faced losing his liberty for up to two years—730 days, 17,520 hours, more than one million minutes—for a crime that both Bearden and he knew he did not commit.

On these facts, the jury's award does not shock our judicial conscience. *See Gordon*, 2019 WL 619186, at \*11 (citing *Pool*, 715 S.W.2d at 635). The evidence is factually sufficient to support that award, and we decline Bearden's request that we suggest a remittitur.

### 2. Reputational harm

We also conclude that the jury's award of $200,000 in total reputational damages is supported by factually sufficient evidence. "Reputational damages are not amenable to exact calculation, so the factfinder must use 'sound judgment' in determining the amount of such damages," and "[s]ound judgment begins with the facts of the case." *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 423 (Tex. 2020) (quoting *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 154 (Tex. 2014)). The facts of this case are pretty egregious, particularly considering the rarefied air of a close-knit community such as the reining world, where reputations can undoubtedly be swiftly destroyed by someone determined to do so and where, for financial reasons, trainers must strive to keep even difficult clients happy.[31]

---

[31]In conceding that his texts with Bearden in May 2012 showed that he wasn't "being a good person" and was "just following along," Johnson testified that Bearden

Although Leclair did not seek or prove any "hard" damages such as lost profits, he did testify to a large drop in gross revenues because of the indictment, some $300,000. Johnson said he became queasy about sending clients Leclair's way—"you needed to distance yourself" from him—and noticed that Leclair had fewer horses to show, to the point that Leclair once had only a single nonprofessional client and no staff at a particular show where Seay stepped in to help him. Before the indictment, Leclair's reputation had been good and on the rise.

As with the mental-anguish damages, our judicial conscience is not shocked on these facts by the jury's aggregate $200,000 award. *See Gordon*, 2019 WL 619186, at *11 (citing *Pool*, 715 S.W.2d at 635). Indeed, it is in line with *Bentley*, which left intact the jury's $150,000 award for reputation damages. 94 S.W.3d at 605–07. Ditto for *Durant*, another case involving a "small and close-knit" community, *see Anderson*, 550 S.W.3d at 612, where we concluded on remand that $400,000 was too high but $150,000 would be appropriate for Anderson's reputation damages stemming from kickback allegations (but no indictment). *Durant*, 2020 WL 1295058, at *33; *see also Vodicka v. Tobolowsky*, No. 05-17-00727-CV, 2019 WL 1986625, at *3 (Tex. App.— Dallas May 6, 2019, no pet.) (mem. op.) (affirming $500,000 in damages for "injury to

---

"was the type of person that somebody needs as a client in this industry," clearly meaning "wealthy." Even so, Bearden did not last long at Johnson's facilities: "We did not have the greatest Futurity, which is a show -- big show in December. And [Bearden] was -- she was pretty upset, and she took it out on my wife and a girl that worked for me. And I -- I had had enough, and I couldn't tolerate the way she was treating people, so we had a discussion."

Ira Tobolowsky's reputation and his mental anguish," where evidence "showed that the harm to his reputation caused him to lose clients and income").

None of those cases involved a malicious prosecution. Bearden's getting Leclair indicted and then immediately defaming him on Facebook does not strike us as unworthy of $200,000 in reputation damages as fair and reasonable compensation, and the evidence supports it.

We overrule Bearden's third issue in its entirety.

## C. Exemplary damages

In her final, conditional issue, Bearden argues that we should revisit exemplary damages if we suggest a remittitur.[32] Because we have declined to do so, we need not reach this issue.

## IX. Conclusion

We overrule Bearden's issues and affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: August 11, 2022

---

[32]Bearden does not otherwise challenge the exemplary-damages award.